636 A.2d 1184

**COMMONWEALTH of Pennsylvania**

v.

**Maurice JONES, Appellant.**

Superior Court of Pennsylvania.

Submitted Dec. 30, 1993.

Filed Feb. 7, 1994.

476

Bernard L. Siegel, Philadelphia, for appellant.

Kathy L. Echternach, Asst. Dist. Atty., Philadelphia, for Commonwealth, appellee.

Before WIEAND, HUDOCK and MONTGOMERY, JJ.

WIEAND, Judge.

Maurice Jones was tried non-jury and was found guilty of first degree murder, possession of an instrument of crime, abuse of a corpse, escape and resisting arrest.[1] Post-trial motions were denied, and Jones was sentenced to life imprisonment for murder and to concurrent terms of imprisonment for possessing an instrument of crime and escape. Sentence was suspended on the convictions for abuse of a corpse and resisting arrest. On direct appeal from the judgment of sentence, Jones asserts that: (1) the evidence at his trial was insufficient to sustain a conviction of murder; and (2) his trial counsel provided ineffective assistance by failing to call character witnesses on his behalf. Because there is no merit in either of these contentions, we affirm the judgment of sentence.

In reviewing a challenge to the sufficiency of the evidence, an appellate court must determine "whether, viewing all the evidence admitted at trial, together with all reasonable

1. Jones was found not guilty of robbery.

inferences therefrom, in the light most favorable to the Commonwealth, the trier of fact could have found that each element of the offense[ ] charged was supported by evidence and inferences sufficient in law to prove guilt beyond a reasonable doubt." *Commonwealth v. Jackson*, 506 Pa. 469, 472–473, 485 A.2d 1102, 1103 (1984). "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Hardcastle*, 519 Pa. 236, 246, 546 A.2d 1101, 1105 (1988), *cert. denied*, 493 U.S. 1093, 110 S.Ct. 1169, 107 L.Ed.2d 1072 (1990). However, "where a conviction is based entirely on circumstantial evidence, 'the theme of guilt must flow from the facts and circumstances proved, and be consistent with them all.' If the conviction is based wholly on ... suspicion and conjecture, it cannot stand." *Commonwealth v. Simpson*, 436 Pa. 459, 464, 260 A.2d 751, 754 (1970), quoting *Commonwealth v. Clinton*, 391 Pa. 212, 218, 137 A.2d 463, 466 (1958). Nonetheless, the facts and circumstances established by the Commonwealth "need not be absolutely incompatible with [the] defendant's innocence, but the question of any doubt is for the [trier of fact] unless the evidence 'be so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.'" *Commonwealth v. Sullivan*, 472 Pa. 129, 150, 371 A.2d 468, 478 (1977), quoting *Commonwealth v. Libonati*, 346 Pa. 504, 508, 31 A.2d 95, 97 (1943).

■ When the evidence in this case is viewed in the light most favorable to the Commonwealth, which won the verdict, the following facts appear. Appellant, also known as Kelsey Jones and "Dream," was second in command of a cocaine distribution organization known as "Strictly Business." The organization was run by the victim, Marcellus Griffin, who was known as "Marty" or "Polo," and its other members included Gerald Butler ("Terminator X" or "Ex") and Kevin Weeks ("Homicide"). All four members of "Strictly Business" resided at 7801 Williams Avenue in the Mount Airy section of Philadelphia. Testimony was that appellant and Griffin had

been close friends and that Griffin had treated appellant like a little brother. Problems had developed, however, and the relationship had begun to sour. In fact, Griffin had planned to put appellant out of the organization because he was "messing up money".

Some time in early April, 1989, Griffin disappeared. He was last seen by his sister, Valerie Ringgold, during the first week of April, 1989, and by his girlfriend, Theresita Outlaw, on April 6, 1989. Outlaw also said that she had talked with Griffin by phone on April 7, 1989, but had not heard from him thereafter. On April 10, 1989, at or about 2:00 a.m., Sherman Paige and his girlfriend, Sarah Davis, were driving past 7801 Williams Avenue when they observed appellant dragging a rolled-up rug, shaped like a human body, towards the driveway. When appellant saw them, he put his hands behind his back and looked towards the sky. Thinking this to be suspicious, Paige and Davis drove around the block, and upon their return saw that appellant was continuing to drag the rug. When appellant again saw them, he reacted as he had before, by folding his hands behind his back and looking skyward. A few days later, appellant came to Paige's home and Paige asked him what he was doing with the body the other night. Appellant replied that it had not been a body, but that he had wrapped his trash to keep the dogs from getting into it.

After Griffin disappeared, appellant responded to inquiries about Griffin's whereabouts by telling some people that Griffin was vacationing in Florida. Others he told that Griffin had gone to New York to raise money to pay a large debt. During this time, appellant was observed wearing Griffin's clothing and jewelry, and he drove Griffin's car, a blue Jetta, which Griffin had never allowed anyone else to drive. Appellant also assumed control of the drug business, telling Gerald Butler that Griffin had left him in charge while he was away. Visitors to the residence at 7801 Williams Avenue found the home to be in disarray. Griffin had always kept the house neat, but now it was a mess. Appellant was constantly spraying air freshener and burning incense in an attempt to hide an odor which witnesses described as being like spoiled meat. There

was also testimony that appellant had obtained a false driver's license which had his picture on it, but which contained Griffin's name.

As appellant continued his efforts to hide Griffin's whereabouts, others became suspicious. On May 5, 1989, Kevin Weeks removed the lock and entered Griffin's bedroom. There he observed that a portion of the rug had been cut out and that there was a large stain on the wall which went from head level to the floor and appeared to be blood and pus mixed together. In the bathroom there were numerous air fresheners, and two fans were blowing air into the bedroom. Later, Weeks went into the garage and found what appeared to be a body wrapped in plastic trash bags, along with the rug from Griffin's room and sheets from his bed. They were tied together with a plastic clothesline. There was a strong odor of rotting meat and there were flies hovering around the body. Upon making this discovery, Weeks contacted his mother and told her what he had found. Weeks also told Griffin's sister, and, on May 13, 1989, the police were contacted. Griffin's body was then found by police in the garage of 7801 Williams Avenue.

After the body was discovered, sixteen year old Andre Davis contacted appellant and told him that the police were at appellant's house. Appellant replied that he had not killed Griffin, but that Jamaican drug dealers had killed him because Griffin owed them a large sum of money. Appellant also told Davis that he had attempted to dispose of the body by taking it to New Jersey to burn it, but had been unable to lift it into the trunk of the Jetta; and, therefore, he had put the body in the garage.

An autopsy was performed on Griffin's body on May 14, 1989. The body was in an advanced state of decomposition and was covered with maggots and pupae cases. It was estimated that Griffin may have been dead for as long as five weeks. The cause of death was determined to be four gunshot wounds to the chest. Recovered from Griffin's chest were four .22 caliber bullets. Appellant was known to carry a .22 caliber handgun.

Finally, there was evidence that appellant, after Griffin's body had been discovered, went to great lengths to avoid being arrested. On May 13, 1989, he removed the license plate from the victim's blue Jetta and put a car cover over it. When the police found him on May 14, 1989 and attempted to arrest him, appellant fled and thereby eluded capture. He was not located by police until November 3, 1989, when he was arrested at 439 East Washington Lane. He tried to escape and cut his hands by attempting to exit through a second story window. The police, therefore, took him to a hospital for medical treatment; and, while there, appellant again escaped by pushing a police officer and fleeing the hospital in hand-cuffs. The following day, November 4, 1989, he was recaptured at the Richard Allen Housing Project. During a struggle with police, appellant was shot in the stomach as he attempted to gain possession of a policeman's gun.

Although there were no eyewitnesses to the murder of Marcellus Griffin, the trial court found that appellant's guilt had been established by overwhelming circumstantial evidence. Appellant argues, however, that the Commonwealth's evidence proved only that he had known of the victim's death and had capitalized on it, but not that he had committed the murder. There was no evidence, he contends, that he had participated in the murder, only that he had attempted to cover up the crime after the victim was already dead. This, appellant argues, is insufficient to sustain his conviction for murder.

We have reviewed carefully the evidence offered in this case and are satisfied that, although circumstantial, it was sufficient to permit the trial court to find, beyond a reasonable doubt, that appellant was criminally responsible for Griffin's death. A motive for the killing was established by evidence that Griffin and appellant had been having a dispute and that Griffin contemplated the removal of appellant from the organization. There was also evidence that appellant had assumed control of the enterprise after Griffin's disappearance and had taken possession of Griffin's property. From this evidence, the fact finder could find that appellant had a motive for

killing Griffin because his place in Griffin's drug organization had no longer been secure and, with Griffin out of the way, appellant, as second in command, could take control of the organization. The evidence also disclosed that appellant had been known to carry a .22 caliber pistol, the type of gun used to kill Griffin. Thus, appellant had the means by which to carry out the killing.

The evidence at appellant's trial was also sufficient to permit an inference that appellant had the opportunity to commit the murder, even though the date and time of the crime could not be established precisely because of the advanced state of decomposition of Griffin's body. From the blood stains on the wall of Griffin's bedroom and from appellant's admission that he had used a portion of the rug to drag Griffin's body from that room, a clear inference could be drawn that Griffin had been killed in his bedroom. Appellant lived in the same house and was Griffin's second in command. Thus, the evidence showed logically that appellant would have had access to Griffin's bedroom, and, as such, had the opportunity to kill Griffin. Certainly, appellant's access to Griffin's bedroom can more logically be inferred from the evidence than access by members of a rival Jamaican drug gang.

Finally, appellant's actions following Griffin's death indicate that he was conscious of guilt and took elaborate steps to avoid detection and apprehension. Appellant attempted to conceal the fact that Griffin was dead by telling friends and relatives of the victim that he had gone to New York or Miami. Appellant also tried to mask the odor caused by the victim's decomposing body and hid the body by wrapping it in trash bags and moving it to the garage. Moreover, when the body was finally discovered, appellant fled and concealed his whereabouts from police. Upon being captured, he escaped from custody; and when re-apprehended, he resisted arrest and was shot during a struggle with police. All of these actions on appellant's part, the trial court could find, combined with other circumstances surrounding the death of Marcellus Griffin to permit an inference of guilt. See: *Commonwealth v. Manchas*, 430 Pa.Super. 63, 70, 633 A.2d 618, 622 (1993);

*Commonwealth v. Pestinikas,* 421 Pa.Super. 371, 387–388, 617 A.2d 1339, 1347–1348 (1992) (en banc). Appellant's conviction for first degree murder, therefore, will not be disturbed.

"Because the law presumes that counsel is effective, the burden of establishing ineffectiveness rests with appellant." *Commonwealth v. House,* 371 Pa.Super. 23, 28, 537 A.2d 361, 363 (1988). The standard used to evaluate claims of ineffective assistance of counsel has been stated by the Pennsylvania Supreme Court in the following manner:

> The threshold inquiry in such claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit; for counsel cannot be considered ineffective for failing to assert a meritless claim. *Commonwealth v. Pursell,* 508 Pa. 212, 495 A.2d 183 (1985). If this threshold is met, it must next be established that the particular course chosen by counsel had no reasonable basis designed to effectuate his client's interests. *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967). Finally, we require that the defendant establish how counsel's commission or omission prejudiced him. *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987).

*Commonwealth v. Durst,* 522 Pa. 2, 4–5, 559 A.2d 504, 505 (1989). "To establish prejudice under this standard 'requires [a] showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' " *Commonwealth v. Carter,* 409 Pa.Super. 184, 187–188, 597 A.2d 1156, 1157 (1991), quoting *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). Moreover,

> "[b]efore a claim of ineffectiveness can be sustained, it must be determined that, in light of all the alternatives available to counsel, the strategy actually employed was so unreasonable that no competent lawyer would have chosen it." *Commonwealth v. Miller,* 494 Pa. 229, 431 A.2d 233 (1981). We inquire whether counsel made an informed choice, which at

the time the decision was made reasonably could have been considered to advance and protect defendant's interests. See *Commonwealth v. Hill,* 450 Pa. 477, 301 A.2d 587 (1973). Thus, counsel's assistance is deemed constitutionally effective once we are able to conclude the particular course chosen by counsel had some reasonable basis designated to effectuate his client's interests. The test is not whether other alternatives were more reasonable, employing a hindsight evaluation of the record. *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 604, 235 A.2d 349 (1967).

*Commonwealth v. Dunbar,* 503 Pa. 590, 596, 470 A.2d 74, 77 (1983).

 Appellant argues that trial counsel was ineffective for failing to call at trial several character witnesses who would have testified to his reputation for being a non-violent person. At the hearing on his post-trial motions, appellant testified that he had informed counsel that the following persons would have been willing to testify as character witnesses on his behalf: Mary Jones, his mother; William Coleman, a friend; Mark Jones, another friend; Bobbi Reservich, a school counselor; and a woman named Erica, whose last name he did not know.[2] On cross-examination, however, appellant admitted that all of his potential character witnesses were aware that he was selling drugs. Trial counsel, James Murray Lynn, Esquire, an experienced criminal lawyer, who has since been elevated to a seat on the Court of Common Pleas, testified that he had discussed with appellant the possibility of using character witnesses and, based upon his experience as an attorney, determined that appellant could not present a viable defense of good character. However, counsel was not able to recall the specific basis for his making this decision.

 The failure to call character witnesses on behalf of a criminal defendant may, under some circumstances, be deemed ineffective assistance of counsel. See, e.g.: *Common-*

2. None of the character witnesses identified by appellant testified at the post-trial evidentiary hearing.

*wealth v. Weiss,* 530 Pa. 1, 606 A.2d 439 (1992); *Common-wealth v. Gillespie,* 423 Pa.Super. 128, 620 A.2d 1143 (1993); *Commonwealth v. Glover,* 422 Pa.Super. 543, 619 A.2d 1357 (1993). The Superior Court has explained:

> A lawyer has a duty to "keep the accused fully informed of all options throughout the proceedings." *Commonwealth v. Saxton,* 516 Pa. 196, 200, 532 A.2d 352, 354 (1987). Additionally, the failure by counsel "to investigate potential-ly meritorious defenses, and/or to interview witnesses whose testimony could prove beneficial and exculpatory to the defendant's case, can constitute ineffective assistance of counsel if no reasonable basis otherwise exists for counsel's failure." *Commonwealth v. Anderson,* 501 Pa. 275, 287, 461 A.2d 208, 214 (1983). Therefore, a lawyer who fails to use character evidence on a defendant's behalf can indeed be deemed constitutionally ineffective if there is no reasonable basis for such failure. See, e.g.: *Commonwealth v. Simler,* 320 Pa.Super. 342, 467 A.2d 355 (1983); *Commonwealth v. Luther,* 317 Pa.Super. 41, 463 A.2d 1073 (1983). However, "[a] decision by counsel not to take a particular action does not constitute ineffective assistance if that decision was reasonably based, and was not the result of sloth or igno-rance of available alternatives." *Commonwealth v. Collins,* 519 Pa. 58, 65, 545 A.2d 882, 886 (1988). "The decision not to present a particular defense is a tactical one and will not be deemed ineffective stewardship if there is a reasonable basis for that position." *Commonwealth v. Blair,* 491 Pa. 499, 506, 421 A.2d 656, 660 (1980).

*Commonwealth v. Mickens,* 409 Pa.Super. 266, 279–280, 597 A.2d 1196, 1203 (1991). Thus, it is well settled that " 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable profes-sional judgments support the limitations on investigation.' " *Commonwealth v. Lee,* 401 Pa.Super. 591, 600–601, 585 A.2d 1084, 1089 (1991), quoting *Strickland v. Washington, supra,* 466 U.S. at 690–691, 104 S.Ct. at 2068, 80 L.Ed.2d at 695.

In *Commonwealth v. Peterkin,* 511 Pa. 299, 513 A.2d 373 (1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987), the Pennsylvania Supreme Court observed that "[a]lthough evidence of good character may not be rebutted by evidence of specific acts of misconduct, a character witness may be cross-examined regarding his knowledge of particular acts of misconduct by the defendant to test the accuracy of his testimony and the standard by which he measures reputation." *Id.* at 318, 513 A.2d at 382–383. Thus, in the instant case, counsel may well have concluded that potential cross-examination of appellant's character witnesses regarding the drug activity in which appellant was engaged offered dangers which outweighed the doubtful value of their testimony regarding appellant's alleged reputation for non-violence. See: *Commonwealth v. Peterkin, supra* at 319, 513 A.2d at 383. Because the record discloses a reasonable basis for trial counsel's decision not to present character evidence on appellant's behalf, counsel will not be deemed ineffective.

The judgment of sentence is affirmed.