J-A10045-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ROY LEE SNYDER | |
| Appellant | No. 1423 MDA 2014 |

Appeal from the Judgment of Sentence July 18, 2014
in the Court of Common Pleas of Berks County
Criminal Division at No(s): CP-06-CR-0005704-2013

BEFORE:  GANTMAN, P.J., MUNDY, J., and JENKINS, J.

MEMORANDUM BY JENKINS, J.:                **FILED JUNE 02, 2015**

Roy Lee Snyder ("Appellant") appeals from the judgment of sentence entered in the Berks County Court of Common Pleas following his jury trial conviction for escape.[1]  We affirm.

The trial court summarized the events underlying Appellant's conviction as follows:

On August 21, 2013, [Appellant] was transferred from SCI-Frackville to the [Alcohol Drug Addiction Probation Parole Treatment ([ADAPPT[)] Halfway House for purposes of being placed under parole supervision.  Mr. Christopher Bardwell was assigned as [Appellant's] state parole supervisor at the time.  On September 30, 2013, [Appellant] was released to parole and discharged with an unsuccessful completion of the ADAPPT Halfway House program for being disrespectful to staff. [Appellant] was held at Berks County Prison until the Board of Probation and [P]arole made a determination in response to

---

[1] 18 Pa.C.S. § 5121(a).

[Appellant's] discharge from ADAPPT. On November 8, 2013, the Board of Probation and Parole made the decision to detain [Appellant] in a secure community corrections center and to hold the violation hearing in abeyance pending completion of the parole violator's program at the correction center.

On November 19, 2013, in the afternoon, [Appellant] was transported to Wernersville Community Corrections Center (WCCC) to complete the parole violator's center program in Building 30. On that date, Mr. Brandon Smith, Community Correction Monitor for WCCC, was assigned to patrol Building 30, which is a locked parole violator facility. At approximately 11:00 p.m., Mr. Smith heard a fire alarm sound, indicating that one of the fire exits in Building 30 was opened. As soon as the alarm went off, Mr. Smith notified all staff in the building that the fire alarm had been activated. Mr. Smith then confirmed that no members of the staff tripped the alarm. Mr. Smith immediately went down to inspect the alarm area and reset the fire alarm. An emergency head count was then conducted by Mr. Smith and additional staff to make sure all parole violators were still present inside Building 30. Each parole violator was instructed to return to their assigned bunk for purposes of performing the "head count."

To determine whether or not an individual is in fact missing, Mr. Smith utilized a checklist which spells out every parole violator[']s name and Department of Corrections (DOC) number. Mr. Smith was then able to cross-reference this checklist with the door cards located on each bunkroom door. The door cards exhibit a photo of each violator assigned to the room and indicate the violator's assigned bunk number. Mr. Smith testified that the only individual not accounted for was [Appellant]. Mr. Smith then proceeded to inspect [Appellant's] wall locker next to his assigned bunk. Mr. Smith confirmed that all of [Appellant's] personal items were missing from his assigned bunk. The only materials left inside [Appellant's] wall locker were the issued items given to him by the WCCC at his time of entry. At approximately 11:51 p.m., Trooper Jason Hope of the Pennsylvania State Police was then notified that [Appellant] had pulled the fire alarm and exited the west side of Building 30. At no time had [Appellant] returned to WCCC.

On November 22, 2013, at about 4:20 p.m., Officer David Samsel was dispatched to Redners Warehouse Market on North 5th Street, Muhlenburg Township, Pennsylvania. Officer Samsel

proceeded to question [Appellant] regarding his identity. [Appellant] did not have identification with him at the time, but informed Officer Samsel that his name was Roy Lee Snyder. [Appellant] then told Officer Samsel that he was court committed at [WCCC]. [Appellant] was then recommitted due to his parole violations.

Trial Court Pa.R.A.P. 1925(a) Opinion, filed October 8, 2014 ("1925(a) Opinion"), pp. 2-4.

Following a trial conducted on June 18, 2014, a jury convicted Appellant of escape. On July 22, 2014, the trial court sentenced Appellant to 30 months to 7 years of incarceration. After the trial court denied his post-sentence motion on July 29, 2014, Appellant filed a timely notice of appeal on August 25, 2014. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issues for our review:

1. Whether the evidence is insufficient to sustain a jury verdict of guilty for the crime of [e]scape charged against [Appellant] because a) he was on parole and not committed to a parole violation center as required by 61 Pa.C.S.[] Section 5006 and b) the Commonwealth failed to prove beyond a reasonable doubt that [Appellant] acted recklessly when he left [WCCC]?

2. Whether the trial court abused its discretion in allowing the Commonwealth to introduce evidence concerning the circumstances that led to [Appellant's] expulsion from ADAPPT as that situation was not related to the charge of [e]scape for which he was on trial?

3. Whether the trial court erred in instructing the jury that the definition of "official detention" excludes only "active" supervision of probation or parole?

Appellant's Brief at 5.

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Thomas G. Parisi, we conclude Appellant's issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of the questions presented. *See* 1925(a) Opinion, pp. 4-20 (finding: (1) Commonwealth proved Appellant's guilt beyond a reasonable doubt where evidence illustrated Appellant was officially detained within WCCC and consciously and willfully removed himself from official detention; (2) trial court did not abuse its discretion in allowing Commonwealth to elicit details of Appellant's expulsion from ADAPPT Halfway House where such details described chronology of events leading to escape and explained Appellant's detention status; and (3) viewing jury instruction as a whole, trial court properly instructed jury on concepts of "official detention"). Accordingly, we affirm on the basis of the trial court's opinion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>6/2/2015</u>

- 4 -

COMMONWEALTH OF PENNSYLVANIA  :   IN THE COURT OF COMMON PLEAS

                               :   BERKS COUNTY, PA

            v.               :   CRIMINAL DIVISION

                               :   NO. CP-06-CR-5704-2013

ROY LEE SNYDER,             :

          Defendant        :   JUDGE THOMAS G. PARISI

Amy Shaffer, Esquire, Attorney for the Defendant

Alisa R. Hobart, Esquire, Appeal Attorney for the Commonwealth

MEMORANDUM OPINION, Thomas G. Parisi *TGP*                 October 8, 2014

Following a jury trial on June 18, 2014, Defendant was convicted of Escape.[1]  On July 18, 2014, this Court imposed a sentence of not less than 30 months nor more than 7 years to the Bureau of Corrections for confinement in a state correctional facility.

On August 25, 2014 Defendant filed a Notice of Appeal.  On September 15, 2014, Defendant filed a Concise Statement of Matters Complained of on Appeal and raises the following issues for review:

> 1. The Court erred in denying Defense's motion for judgment of acquittal at the close of the Commonwealth's case in chief because there was insufficient evidence to establish that Roy Snyder had physically arrived at Wernersville Community Corrections Center on November 19, 2013 thereby making it factually impossible for Roy Snyder to escape that facility.
>
> 2. There is insufficient evidence to sustain the jury verdict of guilty for the crime of Escape against Roy Snyder because the Commonwealth did not establish that Roy Snyder was subject to official detention where he was, in fact, on parole and not committed to a parole violation center as required by 61 Pa. C.S.A. Section 5006 which was enacted in 2012 thereby changing the statutory landscape regarding the law of Escape since the 2009 decision in *Commonwealth v. Maldonado*, 2009 Pa. Super. 15.
>
> 3. The evidence presented at trial is insufficient to sustain the jury verdict of guilty for the crime of escape against Roy Snyder because the Commonwealth failed to prove beyond a reasonable doubt that Roy Snyder acted recklessly when he left Wernersville Correction Community Center when he believed that he had been released from commitment at

---

[1] 18 Pa C.S.A. § 5121(a).

38

Berks County Jail and reinstated onto his original parole to an approved program at the correction community center.

4. The trial court abused its discretion when it overruled Defense's objection to the Commonwealth eliciting testimony from Roy Snyder concerning the circumstances that led to his expulsion from ADAPPT as that situation is irrelevant to the crime of Escape that was charged against Roy Snyder and the introduction of such evidence is not harmless error because it is prejudicial against Defendant and the evidence has no probative value.

5. The trial court erred in instructing the jury that the definition of "official detention" excludes only "active" supervision of probation or parole because 18 Pa. C.S.A. Section 5121 makes no distinction in type or status of supervision.

Defendant's Concise Statement of Matters Complained of on Appeal, 9/15/14.

## FACTUAL HISTORY

On August 21, 2013, Defendant was transferred from SCI-Frackville to the ADAPPT Halfway House for purposes of being placed under parole supervision. Mr. Christopher Bardwell was assigned as Defendant's state parole supervisor at this time. On September 30, 2013, Defendant was released to parole and discharged with an unsuccessful completion of the ADAPPT Halfway House program for being disrespectful to staff. Defendant was held at Berks County Prison until the Board of Probation and parole made a determination in response to Defendant's discharge from ADAPPT. On November 8, 2013, the Board of Probation and Parole made the decision to detain Defendant in a secure community corrections center and to hold the violation hearing in abeyance pending completion of the parole violator's program at the correction center.

On November 19, 2013, in the afternoon, Defendant was transported to Wernersville Community Corrections Center (WCCC) to complete the parole violator's center program in Building 30. On that date, Mr. Brandon Smith, Community Correction Monitor for WCCC, was assigned to patrol Building 30, which is a locked parole violator facility. At approximately 11:00

2

p.m., Mr. Smith heard a fire alarm sound, indicating that one of the fire exits in Building 30 was opened. As soon as the alarm went off, Mr. Smith notified all staff in the building that the fire alarm had been activated. Mr. Smith then confirmed that no members of the staff tripped the alarm. Mr. Smith immediately went down to inspect the alarm area and reset the fire alarm. An emergency head count was then conducted by Mr. Smith and additional staff to make sure all parole violators were still present inside Building 30. Each parole violator was instructed to return to their assigned bunk for purposes of performing the "head count."

To determine whether or not an individual is in fact missing, Mr. Smith utilized a checklist which spells out every parole violators name and Department of Corrections (DOC) number. Mr. Smith was then able to cross-reference this checklist with the door cards located on each bunkroom door. The door cards exhibit a photo of each violator assigned to the room and indicate the violator's assigned bunk number. Mr. Smith testified that the only individual not accounted for was Defendant. Mr. Smith then proceeded to inspect Defendant's wall locker next to his assigned bunk. Mr. Smith confirmed that all of Defendant's personal items were missing from his assigned bunk. The only materials left inside the Defendant's wall locker were the issued items given to him by the WCCC at his time of entry. At approximately 11:51 p.m., Trooper Jason Hope of the Pennsylvania State Police was then notified that Defendant had pulled the fire alarm and exited the west side of Building 30. At no time had Defendant returned to WCCC.

On November 22, 2013, at about 4:20 p.m., Officer David Samsel was dispatched to Redners Warehouse Market on North 5th Street, Muhlenberg Township, Pennsylvania. Officer Samsel proceeded to question Defendant regarding his identity. Defendant did not have identification with him at the time, but informed Officer Samsel that his name was Roy Lee

3

Snyder. Defendant then told Officer Samsel that he was court committed at Wernersville Community Corrections Center. Defendant was then recommitted due to his parole violations.

## DISCUSSION

### I. Insufficient Evidence

Defendant first claims that the evidence admitted at trial was insufficient to establish that he had physically arrived at Wernersville Community Corrections Center on November 19, 2013 thereby making it factually impossible for Defendant to escape that facility.

The standard of review of a sufficiency of the evidence challenge is as follows:

> In reviewing a challenge to the sufficiency of the evidence, we must determine whether, viewing all the evidence admitted at trial, together with all reasonable inferences therefrom, in the light most favorable to the Commonwealth, the trier of fact could have found that each element of the offense charged was supported by evidence and inferences sufficient in law to prove guilt beyond a reasonable doubt.

*Commonwealth v. Jones*, 636 A.2d 1184, 1189 (Pa. Super. 1994).

The reviewing court must determine whether the evidence was sufficient to have permitted the trier of fact to find that each and every element of the crimes charged was established beyond a reasonable doubt. *Commonwealth v. Davidson*, 860 A.2d 575, 580 (Pa. Super. 2004). The facts established by the Commonwealth need not be absolutely incompatible with the defendant's innocence so long as the evidence against the defendant is not "so weak and inconclusive that as a matter of law no probability of fact can be drawn from the circumstances." *Id.* The Commonwealth may meet its burden by means of wholly circumstantial evidence. *Commonwealth v. Craybill*, 926 A.2d 488, 490 (Pa. Super. 2007). The credibility of witnesses and the weight to be accorded the evidence produced are matters within the province of the trier of fact, who is free to

4

believe all, some or none of the evidence. *Commonwealth v. Hughes*, 908 A.2d 928 (Pa. Super. 2006).

In support of his first question, Defendant argues that the evidence adduced failed to establish that he had physically arrived at WCCC on November 19, 2013. However, at trial, Witness Kerry Kerschner, Facility Director at WCCC, testified that Defendant arrived at Building 30 on November 19, 2013, at approximately 1:30 in the afternoon. Notes of Testimony [hereinafter N.T.], p. 40, 6/17/14. Furthermore, Defendant testified at trial that he was in fact present at WCCC on November 19, 2013.

| ADA WEST: | Mr. Snyder, you want the jury to believe that you didn't know that when you pulled that fire alarm on November 19th that it was something different than walking out of ADAPPT? That's what you want the jury to believe? That you didn't know the difference? |
|---|---|
| DEFENDANT: | No, there isn't much of a difference if you are on parole, yes. |

N.T., pp. 131-132, 6/18/14.

| ADA WEST: | So at what point during November 19th did you decide you were going to leave because you wanted to go home? |
|---|---|
| DEFENDANT: | Well I think that, you know, I was a little upset about the conditions that I was violated under while I was at ADAPPT in the first place. Yeah, I was pretty upset about that; and I felt as if I know they had no reason to actually put me under these conditions in the first place and because of that, you know, I just took off. |

N.T., p. 139, 6/18/14.

Defense counsel even admitted to identification of Defendant after Defendant's testimony concluded.

DEFENSE COUNSEL: On the identification point at this point obviously Mr. Snyder has stated he was there. That judgment of acquittal would be moot.

N.T., p. 170, 6/18/14.

Based on the testimony provided at trial, sufficient evidence was presented at trial to establish that Defendant had physically arrived at WCCC on November 19, 2013.

In support of Defendant's second question, Defendant argues that the evidence adduced failed to establish that he was in "official detention" as defined by section 5121(e), as he was on parole at the time he left WCCC. In this case, the trial court convicted Appellant of Escape based upon his failure to return to a Community Correction Center after he left a locked facility building subsequent to his pulling of a fire alarm. The provision of the Crimes Code applicable under such circumstances provides as follows:

§ 5121. Escape

(a) Escape.—A person commits an offense if he unlawfully removes himself from official detention or fails to return to official detention following temporary leave granted for a specific purpose or limited period.

* * * *

(e) Definition.—As used in this section the phrase "official detention" means arrest, detention in any facility for custody of persons under charge or conviction of crime or alleged or found to be delinquent, detention for extradition or deportation, or any other detention for law enforcement purposes; but the phrase does not include supervision of probation or parole, or constraint incidental to release on bail.

18 Pa.C.S.A. § 5121.

6

§ 5006. Escape

An individual committed to a community corrections center or a community corrections facility shall be deemed to be in official detention under 18 Pa.C.S. § 5121 (relating to escape).

61 Pa. C.S.A. § 5006.

Defendant's argument is based on the fact that by leaving WCCC, he committed a violation of parole rather than the crime of Escape. Defendant asserts that when he committed a violation of parole at ADAPPT, instead of recommitting him to jail, the parole board gave him a break by sending him to WCCC as a subsequent condition of his parole. Defendant concedes that he failed to comply with the program at WCCC. However at the time he left Building 30 at WCCC, Defendant argues he was under parole supervision and was therefore not subject to "official detention" as defined by the Escape statute, section 5121(e).

Mr. Charles Fox, Chief Hearing Examiner for the Board of Probation and Parole, testified that on November 8, 2013, administrative action was taken by the Board of Probation and Parole, where it was ordered that Defendant be detained in a secure community corrections center and to hold the violation hearing pending completion of the parole violator's center program. N.T., pp. 84-85, 6/17/14; *see* Defendant's Exhibit 1. The record verifies that when Defendant was sent to Building 30 at the WCCC parole violation center, Defendant's parole status changed from active parolee to detaine parolee. Mr. Fox explained that when a defendant is being committed to a parole violation center the parolee's status changes from the status previously in effect when supervised by a parole agent at ADAPPT. Mr. Fox testified to the following:

7

> We refer to them in this status as a detained parolee. They are essentially waiting a violation decision. At the Wernersville Center, as in the other parole violation centers throughout the Commonwealth, they assign a different agent there for monitoring of this individual while they are there. But they are not – they actually close the field case while they are in the center because they are not considered to be out under active supervision in the community. In other words, they cannot leave the center. They are pretty much restricted to the center while they are there.

N.T., p. 91, 6/17/14.

When asked if Agent Bardwell supervised active street time for people as opposed to someone who is detained in Building 30, Mr. Fox confirmed the supervision by Agent Bardwell is different from detained parolee supervision. N.T., pp. 90-91, 6/17/14. Mr. Fox stated that for the time Defendant is in custody at the parole violator center (WCCC), Defendant would receive credit for jail time for he was in detained parolee status. N.T., pp. 91-92, 6/17/14. Mr. Fox confirmed that if a defendant is in detained status, a defendant gets credit for the time that defendant is detained just as if he was incarcerated. If a defendant is in a halfway house like ADAPPT, Mr. Fox testified that the time spent counts towards parole time, not jail time. N.T., p. 92, 6/17/14.

Mr. Kerry Kerschner, Facility Director at the Wernersville Community Corrections Center, testified that there are three buildings at the WCCC. N.T., p. 37, 6/17/14. Mr. Kerschner confirmed that Building 30 is the parole violator center and Building 18 and Building 27 are general housing for offenders who do not have approved home plans through the Board of Probation and Parole. N.T., p. 38, 6/17/14. Mr. Kerschner stated that Building 30 houses those placed there under a board action or a warrant by parole, and that the facility is locked at all times. N.T., pp. 38-39, 6/17/14. Mr. Kerschner testified that the only circumstances under which offenders can leave Building 30 is either due to a medical emergency or to be returned to prison. N.T., p. 39, 6/17/14.

8

The record verifies that Defendant's parole status was that of detained parolee when he left Building 30, distinguishable from active, supervised parole. Mr. Fox confirmed at trial that the Board of Probation and Parole issued an administrative action on November 8, 2013, ordering Defendant be "DETAIN[ED] IN PV CENTER." N.T., p. 87, 6/17/14; *see* Defendant's Exhibit 1.

In *Commonwealth v. Maldonado*, 966 A.2d 1144 (Pa. Super. 2009), the Pennsylvania Superior Court held:

> Once a parolee is arrested and detained for failing to report, and acknowledges he is essentially in prerelease status, he is in official detention for purposes of section 5121 just as any other person placed in custody is. As such, he can hold no reasonable expectation that he retains the liberties and freedoms customary to a person operating under "supervision of parole.

*Id.* at 1148.

In *Commonwealth v. Davis*, 852 A.2d 392 (Pa. Super. 2004), the Pennsylvania Superior Court affirmed judgment of sentence under section 5121 for an inmate who had been removed from prison and housed at Penn Capp in "prerelease" status at the time he left the facility without permission. The Superior Court found that a parolee in an in-patient treatment program such as a halfway house is "not deemed to be in official detention, but rather at liberty on parole." A parolee at a halfway house will not be charged with escape as they are not similarly situated with the "pre-release" inmates, who are deemed to be in "official detention" for purpose of credit for time spent at the halfway house. *Id.* at 397-98; *see Jackson v. Pennsylvania Bd. Of Probation and Parole*, 568 A.2d 1004 (Pa. Cmwlth. 1990). However, "pre-release" inmates at the halfway house are considered to be in custody, not at liberty on parole. If a "pre-release" inmate was to leave the halfway house, the "pre-release" inmate could be convicted of Escape under section 5121. Defendant claimed when he was out of prison, he was on parole, and thus eligible for the

"supervision of parole" exclusion while at the halfway house. *Id.* at 397-98. The Superior Court rejected this claim, reasoning that "prerelease" translates to "prior to release," finding parole could not have commenced as long as the defendant was in "prerelease" status. *Id.* at 396. The Superior Court held defendant was not on parole when housed at the halfway house due to the fact he was receiving credit for jail time and was facing restricted liberties. The Superior Court found his unauthorized departure from the institution constituted removing himself from "official detention."

Looking at the testimony and exhibits provided at trial, Defendant's status while in Building 30 is distinguishable from his active parole status while housed at ADAPPT. Defendant's status runs parallel to the "pre-release" status found in *Davis* and *Maldonado*. Building 30 is a specific locked facility for parole violators. Offenders cannot leave Building 30 except for medical emergency or to be returned to prison. Once placed in Building 30, Defendant was no longer supervised by a field parole agent nor was Defendant receiving parole credit time. While Defendant was under detained parolee supervision in Building 30, Defendant was to receive jail time credit, similar to the defendant in "pre-release" status in *Davis*. Additionally, Defendant's liberty to leave the facility was severely restricted.

Based on these facts, while under detained parolee supervision in Building 30, Defendant could hold no reasonable expectation that he retained the liberties and freedoms customary to a person operating under "supervision of parole." Consequently, Defendant was properly subject to a charge of Escape upon leaving the WCCC facility while under such detained supervision. Therefore, his unauthorized departure from WCCC constituted removing himself from official detention. As Defendant does not

10

dispute his conduct in leaving the facility without authorization, the evidence is sufficient to sustain his conviction for Escape.

Defendant next contends that the evidence presented at trial is insufficient because the Commonwealth failed to prove beyond a reasonable doubt that Roy Snyder acted recklessly when he left WCCC when he believed that he had been released from commitment at Berks County jail and reinstated onto his original parole to an approved program at the correction community center.

The Escape statute itself fails to specify the level of scienter necessary to sustain a conviction. Consequently, we apply the default standard specified by 18 Pa.C.S. § 302, which provides in relevant part as follows:

§ 302. General requirements of culpability

\* \* \* \*

(c) Culpability required unless otherwise provided.—When the culpability sufficient to establish a material element of an offense is not prescribed by law, such element is established if a person acts intentionally, knowingly or recklessly with respect thereto.

18 Pa.C.S. § 302(c).

Section 302 also defines the applicable degrees of culpability:

(b) Kinds of culpability defined.—

(3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and

11

the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b)(3).

Defendant argues that he did not receive the November 8, 2013 Board of Probation and Parole administrative action until discovery was provided in this case. N.T., p. 133, 6/18/14. Although Defendant confirmed at trial that he admitted to violating his parole at ADAPPT, Defendant claims no one informed him of the conditions to be imposed as a result of such violations. N.T., pp. 163-64, 6/18/14. Defendant stated that he believed he was going to do nine (9) months in a state correctional institution considering this was his second time violating the conditions of his parole. N.T., p. 163, 6/18/14. Defendant testified that he "never had a chance to get any rules or regulations from anybody [at WCCC]." N.T., p. 167, 6/18/14.

Although Defendant claimed he did not receive a letter from the Parole Board informing him of its decision and change in parole status, Mr. Fox testified otherwise.

| MR. FOX: | The Defendant would have been served with this [Parole Board Administrative Action] as well copies go to the agent involved in the case. It goes to – there is copies to the file copies to the prison where he is being sent and essentially what it is telling the prison or if he was in a secure facility like a county jail or a SCI it would tell them that at that point to move him to this secure community corrections center. |

\* \* \* \*

| ADA WEST: | What is the message to him? What is the conveyance? |
| MR. FOX: | It tells them that they have to remain in that parole violation center and to complete this program. And if they complete the program, then essentially they would not be recommitted on the technical parole violations. |

12

N.T., pp. 87-89, 6/17/14.

Moreover, this was not Defendant's first time at WCCC and he testified to his knowledge that Building 30 was a locked facility.

DEFENDANT: I was at Wernersville two other occasions but different building, yes.

ADA WEST: What other buildings were you in?

DEFENDANT: I was in Building 18.

ADA WEST: And in Building 18 could you sign out?

DEFENDANT: Yes, in order for you to leave you are going to have to get permission from the place to leave, yes.

ADA WEST: But you could just walk out the door?

DEFENDANT: No, you can't just —

ADA WEST: You don't have to pull an emergency alarm?

DEFENDNAT: No, you cannot walk out them doors either. All of them doors are locked under the same conditions as Building 30.

N.T., pp. 151-52, 6/18/14.

THE COURT: Based upon your prior experience in another building at Wernersville you knew that the only way that people came in and out are the front door, correct?

DEFENDANT: Yes.

THE COURT: There were other doors which were fire exits?

DEFENDANT: There is many doors, yes, yeah.

THE COURT: You are not allowed to go out those doors, you know that, correct?

13

DEFENDANT:          Well, I mean someone stated that they were locked, yes, yeah. I knew you couldn't get out the doors unless you pulled the handle on the alarm, yes.

THE COURT:          That was not just based on what you were told that day but it was based upon your prior experience on a similar building elsewhere on the campus?

DEFENDANT:          Yeah, that the doors were all locked on the sides, yes.

N.T., pp. 167-68, 6/18/14.

The jury in this matter was free to accept or reject Defendant's testimony concerning his understanding of his parole status at the time he was transferred to WCCC. "While the sufficiency of the evidence is for the court, the weight thereof is a matter exclusively for the fact finder." *Commonwealth v. Thomas*, 282 A.2d 693, 697 (Pa. 1971)(citations omitted). Based on the evidence provided at trial, this Court is bound by findings that result from resolutions of credibility and conflicting testimony. The jury found Mr. Fox's testimony to be more credible and the mere fact that Mr. Fox's testimony was contradicted will not take the question of its credibility from the jury. Defendant testified at trial that he was not of the understanding that his parole supervision or status was any different from the time he left ADAPPT for WCCC. N.T., pp. 131-32, 6/18/14. Defendant stated his understanding at the time he was taken to WCCC was that he had merely violated conditions of his parole, and would not be charged with escape for leaving WCCC, rather he would be charged with absconding. N.T., pp. 129-132, 6/18/14. However, Mr. Fox's testimony and Defendant's prior experience suggest otherwise. Mr. Fox's testimony indicated that Defendant was served with notice of the administrative action taken by the Board of Probation and Parole.

Although Defendant claims he was unaware of his status at WCCC, Defendant had been placed in Building 18 on two prior occasions. Defendant explained his understanding that one

14

could only leave Building 18 with signed permission, and that exit and entry was only allowed through the front door of each facility building. Defendant had knowledge that the doors were triggered with alarms, and that exiting through the fire exits was not a proper form of exit from the facility. Furthermore, not only was Defendant aware that the facilities were locked, but likely understood that Building 30 was a facility specifically housing parole violators, who are charged with Escape if they leave without authorization. When Officer Samsel encountered Defendant at Redners after his fleeing of WCCC, Defendant even told Office Samsel he was "court committed to WCCC." N.T., p. 60, 6/17/14.

Based on Defendant's known prior experiences at WCCC and admission of commitment, the jury found Defendant's testimony to be less credible. This Court is well within its discretion to reject the Defendant's claim that he believed he was reinstated onto his original parole. Additionally, it is apparent Defendant consciously disregarded a substantial and unjustifiable risk that he would be charged with Escape as a result of his conduct. Defendant's placement in Building 30 and notice of his detainment in the parole violator's center served as a warning to Defendant that his supervision status had changed. Defendant chose to disregard these warnings, involving a gross deviation from the standard of conduct that a reasonable person would observe in his situation, thereby acting recklessly when making the decision to leave WCCC in an unauthorized manner. Thus, the evidence presented at trial was sufficient to support the Defendant's conviction of Escape.

## II. Abuse of Discretion

Defendant claims this Court abused its discretion when it overruled Defense's objection to the Commonwealth eliciting testimony from Defendant concerning the circumstances that led to his expulsion from ADAPPT as that situation is irrelevant to the crime of Escape that was

15

charged against Roy Snyder and the introduction of such evidence is not harmless error because it is prejudicial against Defendant and the evidence has no probative value.

The scope and manner of cross-examination are within the trial court's discretion, and that discretion will not be disturbed absent its abuse or an error of law. *Commonwealth v. Wilson*, 649 A.2d 435, 445 (Pa. 1994). "The right of cross-examination includes the right to examine the witness on any facts tending to refute inferences or deductions arising from matters the witness testified to on direct examination." *Rafter v. Raymark Industries, Inc.*, 632 A.2d 897, 900 (Pa. Super.1993) (quoting *Kemp v. Qualls*, 473 A.2d 1369, 1371 (Pa. Super. 1984)). "Generally, [e]very circumstance relating to the direct testimony of an adverse witness or relating to anything within his or her knowledge is a proper subject for cross-examination, including any matter which might qualify or diminish the impact of direct examination." *Jacobs v. Chatwani*, 922 A.2d 950, 965 (Pa.Super. 2007).

During trial, Defendant was questioned by Defense Counsel about his technical parole violations resulting in his removal from the ADAPPT program. N.T., p. 127, 6/17/14. Defense Counsel also questioned Agent Bardwell about Defendant's violation of parole conditions at ADAPPT as well. N.T., p. 67, 6/17/14. Commonwealth's Exhibit 1 was introduced at trial, which is a copy of Defendant's Discharge Summary from ADAPPT. Agent Bardwell testified to the following about the Commonwealth's Exhibit:

> AGENT BARDWELL: Yes. This states that on November 30, 2013 that he was released to parole and discharged from the facility with an unsuccessful completion of the program at the halfway house and, yes, that I recall, yes, that's the date.

N.T., pp. 74-75, 6/17/14.

Considering the Defendant's Discharge Summary from ADAPPT was entered into evidence and Defendant's parole violations at ADAPPT were a topic of discussion, it was proper

16

to permit the Commonwealth to inquire into the incident that triggered Defendant's eventual transfer to WCCC. In setting limits on cross-examination, this Court believed such questioning was not likely to confuse or mislead the jury. Additionally, the parole violations committed by Defendant at ADAPPT were not only relevant to aid in the understanding of the chronology of events leading up to Defendant's eventual transfer to WCCC, but also helped in distinguishing the difference between his parole status in the halfway house when compared to his detained status inside Building 30. The helpfulness of the testimony outweighed its potential confusion or prejudice, thereby this Court did not commit an abuse of discretion when it overruled Defense's objection to the Commonwealth eliciting testimony from Defendant concerning the circumstances that led to his expulsion from ADAPPT.

### III. Trial Court Error

Defendant's final claim is that this Court erred in instructing the jury that the definition of "official detention" excludes only "active" supervision of probation or parole because 18 Pa.C.S.A. § 5121 makes no distinction in type or status of supervision.

When examining the propriety of the instructions the trial court provides to a jury, the reviewing court must determine whether the trial court committed a clear abuse of discretion or committed an error of law which controlled the outcome of the case. *Commonwealth v. Thomas,* 904 A.2d 964, 970 (Pa. Super. 2006). A jury charge is grounds for reversible error only if the charge, when read as a whole, is inadequate, unclear, or has a tendency to confuse or mislead, rather than clarify, a material issue. *Id.* Moreover, trial courts have broad discretion in phrasing their jury instructions and are not limited to using particular language so long as the applicable law is explained clearly, adequately, and accurately to the jury. *Commonwealth v. McClendon,* 874 A.2d 1223, 1232 (Pa. Super. 2005).

17

At trial, this Court provided the jury with the suggested Pennsylvania Standard Jury Instruction, 15.5121A. Ultimately, the trial court instructed the jury as follows on the matter of escape:

**THE COURT:**

The defendant has been charged with the offense of escape. To find the defendant guilty of this offense, you must find that the following elements have been proven beyond a reasonable doubt: First, that the defendant was under official detention. Official detention includes arrest or being informed by law enforcement that an arrest warrant exists for him and that he is in fact under arrest or detention in any facility for custody of persons under charge or conviction of crime or detention for law enforcement purposes. The second element is that the defendant unlawfully removed himself from the official detention. Now if, and only if, you find that the above elements have been proven beyond a reasonable doubt, you must then indicate on the verdict form whether you find the following element also proven to that standard: that final element is that the defendant was under arrest for or detained on a charge of felony. The parties stipulated that the Defendant's original offense was a felony.

Now irregularity in bringing about or maintaining detention or lack of jurisdiction of the committing or detaining authority is not a defense to a charge of escape. Those are the basic elements for you to consider. I would note that under the law the phrase official detention does not include **active supervision** of probation or parole.

To be convicted of escape, it must be proven beyond a reasonable doubt that a person acted intentionally, knowingly, recklessly as to the question of whether the person was under official detention. A person acts intentionally when it is his conscious

18

objective or desire to engage in the conduct or cause the result. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause a result. A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct.

For recklessly, the risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a person, a reasonable person would observe in the actor's situation. Now an individual committed to a community corrections center or a community corrections facility shall be deemed to be in official detention under the statute relating to escape. Once a parolee is arrested and detained for failing to report, he is in official detention.

If the Defendant understood that the nature of his placement had materially changed and that he was now housed in a facility in which his freedom was substantially restricted, then you may conclude that he had the necessary state of mind that he was in detention. Now because neither the scope of supervision of parole nor the interplay of the phrase with the remainder of the statute has ever been specified you may find that the statutory language is ambiguous under the present facts such that statutory interpretation is warranted.

I would note that the Pennsylvania Statutory Construction Act requires that penal provisions that would be a statute about a crime, where there is a penalty, penal provisions of statutes must be strictly construed thus where thereabout [sic – transcription error] an ambiguity in the language of the penal statute such language should be

19

interpreted in the light most favorable to the accused by the Statutory Construction Act also requires that the object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly.

When the words of the statute are not explicit the intention of the General Assembly may be ascertained by considering there are actually six factors, three of which may apply to this case. Those factors would be the occasion and necessity for the statute, the mischief to be remedied, and the object to be attained.

N.T., pp. 194-197, 6/18/14.

The instructions as a whole fairly convey the required legal principles at issue in this case. This Court added additional language to the standard instruction because of the ambiguity in the law which has caused confusion in numerous jurisdictions. In reviewing a challenged jury instruction, we must review the charge not in isolated portions but as a whole to ascertain whether it fairly conveys the required legal principles at issue. *Commonwealth v. Bracey*, 831 A.2d 678 (Pa.Super.2003). The term "active supervision" could be found in a single sentence of this Court's instructions to the jury to help differentiate between active and detained supervision which was a common theme throughout the jury trial. Looking at the entirety of the instructions the law was clearly and accurately presented to the jury and the trial court did not err by including the term "active supervision."

Therefore, this Court respectfully requests that the Defendant's appeal be denied.

20