**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Nyankun A. THOMAS, Appellant.**

Superior Court of Pennsylvania.

Submitted April 10, 2006.

Filed July 27, 2006.

W. Russell Carmichael, Media, for appellant.

William R. Toal III, Asst. Dist. Atty., Media, for Com., appellee.

1. 18 Pa.C.S.A. § 3121(a)(1).

2. 18 Pa.C.S.A. § 3122.1.

3. 18 Pa.C.S.A. § 3125.

4. 18 Pa.C.S.A. § 3126(a)(1).

5. 18 Pa.C.S.A. § 2903(a).

BEFORE: FORD ELLIOTT, P.J., STEVENS, and TAMILIA, JJ.

OPINION BY STEVENS, J.:

¶ 1 Following a jury trial which commenced on June 16, 2003, Appellant Nyankun Thomas was found guilty of Rape,[1] Sexual Assault,[2] Aggravated Indecent Assault,[3] Indecent Assault,[4] False Imprisonment,[5] Unlawful Restraint,[6] Simple Assault,[7] Terroristic Threats,[8] and seven (7) counts of Criminal Conspiracy.[9] Appellant appeals *nunc pro tunc* from the judgment of sentence entered in the Court of Common Pleas of Delaware County on September 23, 2003, at which time Appellant was sentenced to an aggregate term of five (5) years to ten (10) years in a state correctional institution followed by two (2) years probation. We affirm.

¶ 2 The relevant facts and procedural history in the instant matter are as follows: The victim, P.H., testified that on June 26, 2002, at about 10:00 p.m., she was seventeen (17) years of age and attending a pool party at a friend's home. N.T., 6/17/03, at 20, 23. At approximately 10:35, P.H. was pushed into the pool; P.H. was wearing white sweatpants, a white shirt, underwear and a bra at the time. N.T., 6/17/03, at 23. Without changing her clothing, which was still partially wet, P.H. decided to walk home and said goodbye to her friends. N.T., 6/17/03, at 23–25.

¶ 3 When P.H. was halfway to her home, she saw Appellant, Tia, and another, un-

6. 18 Pa.C.S.A. § 2902(a)(1).

7. 18 Pa.C.S.A. § 2701(a).

8. 18 Pa.C.S.A. § 2706(a)(1).

9. 18 Pa.C.S.A. § 903(a)(1).

identified boy coming toward her.[10] N.T., 6/17/03, at 25. She recognized Appellant and Tia because she had met them three nights before while walking with her cousin. N.T., 6/17/03, at 26. The boys asked P.H. to "sit down and chill on the sidewalk," and P.H. agreed. N.T., 6/17/03, at 26. The group discussed school while two boys sat on one side of P.H., and the third boy sat on her other side. N.T., 6/17/03, at 26. Tia, Appellant or the individual who resembled him, eventually left Appellant and P.H. alone for approximately five minutes.[11] N.T., 6/17/03, at 31.

¶ 4 P.H. had a five to ten minute walk ahead of her and an 11:00 p.m. curfew. N.T., 6/17/03, at 28. As she had to get home, she began to stand up, at which time Appellant told her "you're not going home." N.T., 6/17/03, at 31. When P.H. asked Appellant to explain his comment, the latter replied "you're not finished." N.T., 6/17/03, at 31. As P.H. tried to stand up, Appellant grabbed her arm, and P.H. slapped him with her free hand. N.T., 6/17/03, at 32. With his free hand, Appellant, or "the boy who looked like him," ' pulled down his pants and P.H.'s pants, as she continued to scream and slap him. N.T., 6/17/03, at 33. The other boys came out from somewhere in front of P.H. N.T., 6/17/03, at 34. The three pushed her to the ground and the one who had been on top of her placed his penis in her vagina, on her stomach, and ejaculated on her underwear and thighs. N.T., 6/17/03, at 39–42.[12] P.H. pushed and kicked the individual penetrating her, the others released her hands, and she ran to the porch of a nearby house, because the boys had indicated to her they knew where she lived and shouted her address. N.T., 6/17/03, at 40, 43–45.

¶ 5 P.H. proceeded to her home and after she arrived there, she washed her legs off with a hose in the back yard. N.T., 6/17/03, at 45. P.H. went to her front yard and entered her home. N.T., 6/17/03, at 46. P.H. placed her underwear in a plastic bag and laid her clothing in the closet to dry. N.T., 6/17/03, at 47.

¶ 6 When she initially entered the home at about 11:10, P.H. saw her mother sitting in front of the television and about to fall asleep. N.T., 6/17/03, at 47–48. P.H. did not tell her mother what had happened. N.T., 6/17/03, at 47. P.H. proceeded to the basement with her cordless phone to call her cousin, Ileana, at approximately 11:15. N.T., 6/17/03, at 48. P.H. explained to Ileana she was in "deep crap and [she] told her the story, what happened." N.T., 6/17/03, at 48. Though she did not utilize the word rape in her discussion, P.H. explained to Ileana that she saw Thomas, Tia and another young man and described what they did to her. N.T., 6/17/03, at 49. The two spoke on the phone for approximately fifteen minutes. N.T., 6/17/03, at 52. When the phone conversation ended, P.H. took a shower, after which Nadia, Ileana's sister, called P.H. to discuss the incident. N.T., 6/17/03, at 52.

¶ 7 P.H. went to sleep at approximately 1:00 a.m. and woke up at around 8:00 a.m. or 9:00 a.m. N.T., 6/17/03, at 54. Though

10. Throughout her testimony, Appellant often referred to this individual as the "kid that looks like Thomas."

11. Though P.H.'s testimony suggested she was unsure which boy remained with her, she identified Appellant in court as the boy to whom she continued speaking. N.T., 6/17/03 at 30.

12. P.H. testified Tia and either Appellant or the other boy who resembled him came out and that Appellant or the other young man pinned down her right arm. She also stated "[Appellant] or the other kid got on top of me . . . ." N.T., 6/17/03, at 34–35.

P.H. thought her grandmother was in the home that morning, she did not speak to her about what had transpired the prior evening. N.T., 6/17/03, at 54. Instead, P.H. took a trolley to her cousins' house, at which time the girls told P.H.'s aunt, Ileana and Nadia's mother, about the attack. N.T., 6/17/03, at 55. P.H. began crying and her aunt called the police. N.T., 6/17/03, at 57. P.H.'s aunt then contacted P.H.'s mother, her sister, at work and told her about the incident. N.T., 6/17/03, at 57–58.

¶ 8 P.H., Nadia, her aunt and her mother went to the Upper Darby Police Station and spoke to Detective Graff about what had happened to P.H. the prior evening. N.T., 6/17/03, at 58. P.H. was taken to Delaware County Memorial Hospital where she underwent a physical examination. N.T., 6/17/03, at 60–65. P.H. cried because she found the vaginal examination uncomfortable and was bothered by a lingering smell on her body. N.T., 6/17/03, at 65.

¶ 9 When P.H. had initially met the three boys, she noticed that Appellant and Tia had what she described as a "Jamaican or African" accent. N.T., 6/17/03, at 70. She was "almost positive" Appellant was the one who inserted his penis into her vagina. N.T., 6/17/03, at 120.

¶ 10 Ileana Evangelopoulos testified she is P.H.'s fourteen-year-old cousin and they are also best friends. N.T., 6/17/03, at 156, 159. Ms. Evangelopoulos recalled speaking with P.H. on June 26, 2002, at which time the latter, her voice shaking, explained the sexual attack upon her. N.T., 6/17/03, at 159–161. Ms. Evangelopoulos asked P.H. if she were injured to which P.H. replied she was frightened, did not know what to do, and was unsure if she should tell her mother what had happened to her, because the boys indicated they knew where she lived and she feared for her family's safety. N.T., 6/17/03, at 161, 169. Ms. Evangelopoulos advised P.H. to tell her mother what had happened, to take a shower, and to call her back when she was finished. N.T., 6/17/03, at 169.

¶ 11 Ms. Evangelopoulos's sister and she spoke to P.H. again later that evening. N.T., 6/17/03, at 170. The three made an agreement that the next day P.H. would come to her cousins' home and tell their mother what had happened; this meeting did occur at around 12:00 or 1:00 the following afternoon. N.T., 6/17/03, at 171. P.H.'s aunt called P.H.'s mother at work and told her what had happened to P.H. N.T., 6/17/03, at 172.

¶ 12 Detective Raymond K. Graff testified that on June 27, 2002, at approximately 1:00 p.m., he received information that a victim of a sexual assault would be coming to the Upper Darby Police Station. N.T., 6/18/03, at 6. Upon meeting with P.H., detective Graff brought her into a conference room with him at which time she relayed the story of the assault to him in a conversation which lasted about twenty minutes. N.T., 6/18/03, at 6–17. Thereafter, Detective Graff took P.H. to Delaware County Hospital where a rape kit was completed. N.T., 6/18/03, at 17. Upon their return to the police station, P.H. placed her narrative in writing while Detective Graff prepared the rape kit to be sent out for analysis. N.T., 6/18/03, at 22. Detective Graff remarked that P.H. began to look pale and sluggish after she completed the written narrative, and P.H. indicated to Detective Graff that she did not feel well and asked to use the ladies' room. N.T., 6/18/03, at 23. The question/answer portion of the interview ended prematurely in light of P.H.'s condition. N.T., 6/18/03, at 23.

¶ 13 Appellant testified that he emigrated from the Republic of Liberia and had been in the United States for four years.

N.T., 6/19/03, at 282. Appellant denied raping P.H., holding her down so that Tia or his brother could assault her, or removing any of her clothing. N.T., 6/19/03, at 285. Appellant did state that he saw P.H. on the evening of June 26, 2002, somewhere between 11:00 p.m. and midnight, and Appellant was home by 12:30 a.m. N.T., 6/19/03, at 303–304, 311. Appellant stated when he saw P.H., she was on the opposite side of the street walking toward him by herself, he did not remember what she was wearing, and he did not smell chlorine on her that evening. N.T., 6/19/03, at 311–312. Appellant did not speak to P.H. at all as she passed. N.T., 6/19/03, at 317.

¶ 14 After Detective Graff arrested Appellant and took him into custody, Appellant denied having committed a rape and refused to write a statement at the police barracks. N.T., 6/19/03, at 294–295.

¶ 15 On June 20, 2003,[13] both parties rested and the trial judge discussed the proposed jury charges of Appellant. Specifically, Appellant requested that the trial court provide the jury an instruction on prompt complaint, to which the Commonwealth responded that a prompt complaint instruction was unnecessary. N.T. 6/20/03, at 30. In explaining its reasoning on the issue, the trial court appears to have reached the opposite conclusion: "[t]he testimony is that she came home and called her cousin and told her cousin. My recollection is that-well all right, it's there, because..." N.T. 6/20/03, at 31.

¶ 16 Upon hearing further argument from both sides, the trial court stated "[a]ll right, I am not going to give an instruction on failure to make a prompt complaint." N.T. 6/20/03, at 33. In response, counsel for Appellant objected and moved to amend. N.T. 6/20/03, at 33. After listening to some additional argument, the trial court once again appears to have indicated its intention to provide the instruction by stating "[y]ou know what, counsel, all right...." N.T. 6/20/03, at 34. Counsel for Appellant stressed that were the instruction not given, he intended to move for a mistrial. N.T. 6/20/03, at 34–35. In response, the trial court indicated, "[c]ounsel, I'll give it. I will... I'm giving it." N.T. 6/20/03, at 36. Additional argument by the parties followed, which prompted the trial court to waver again and state: "I'm not going to give it. I'm not going to give it. Okay, now and you're on the record, so I'm noting your objection for the record." N.T. 6/20/03, at 40. In response, counsel for Appellant moved for a mistrial, which motion the trial court denied. N.T. 6/20/03, at 40–41.

¶ 17 The parties went off the record, and the trial court later explained on the record that having done some further research on the prompt complaint defense issue, it would give the failure to make a prompt complaint instruction. N.T. 6/20/03, at 40–41. The court then recessed for lunch, after which the Commonwealth presented the trial court with caselaw regarding the instruction issue. Based upon its reading of the cases the Commonwealth provided, the trial court ultimately determined that "I will not be giving an instruction on that, okay?" N.T. 6/20/03, at 57–58. Counsel for Appellant noted his objection to the court's refusal to provide the instruction and his motion for mistrial on the record. N.T. 6/20/03, at 58.

¶ 18 During its charge to the jury, the trial court instructed the jury regarding the specific charges made against Appellant, and in fact, did not include an instruction regarding a failure to make a prompt complaint.

---

13. The transcript of this hearing is erroneously dated June 20, 2004.

¶ 19 On June 23, 2003, the jury found Appellant guilty of all charges. On September 23, 2003, Appellant was sentenced to an aggregate term of five (5) years to ten (10) years in a state correctional institution followed by two (2) years probation.

¶ 20 Appellant filed timely Post Sentence Motions on September 26, 2003, which were denied by operation of law on January 26, 2004. On February 2, 2004, Appellant filed a Notice of Appeal from the Order denying Appellant's Post Sentence Motions.

¶ 21 On March 16, 2004, the trial court ordered Appellant to file a Concise Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P.1925. Appellant failed to comply with said Order, and on May 5, 2004, the trial court issued an Opinion in which it requested Appellant's claims be denied as a result of Appellant's failure to properly and timely litigate the matters in post-sentence motions.

¶ 22 On February 11, 2005, this Court issued a Memorandum Opinion in which we affirmed Appellant's judgment of sentence and determined that he had waived his claim regarding the prompt complaint jury instruction.

¶ 23 On April 13, 2005, Appellant, through new counsel, filed a Post Conviction Relief Act (PCRA)[14] petition alleging that prior counsel had been ineffective for failing to preserve the prompt complaint jury instruction issue for appeal. In a correspondence dated April 19, 2005, the Commonwealth wrote a letter to the PCRA court and relying upon *Commonwealth v. Halley,* 582 Pa. 164, 870 A.2d 795 (2005), indicated that it agreed prior counsel had been ineffective in his representation of Appellant. Brief for Appellee at 7.

¶ 24 On May 4, 2005, the lower court issued an Order in which it permitted Appellant to pursue his direct appeal *nunc pro tunc* and directed counsel to file a concise statement of matters complained of on appeal or post-sentence motions, if appropriate, within thirty (30) days of the date of that order. On May 25, 2005, Appellant filed a Motion for Post–Sentencing Relief in which he claimed the trial court erred in refusing to instruct the jury on the "prompt complaint" doctrine. The trial court denied the same by an Order dated August 17, 2005.

¶ 25 Appellant filed a timely Notice of Appeal on September 15, 2005, and on September 30, 2005, the lower court ordered Appellant to file a statement of matters complained of on appeal pursuant to Pa.R.A.P.1925. Appellant filed his Statement of Matters Complained of on Appeal on October 13, 2005, in response to which the trial court filed an Opinion on December 21, 2005.

¶ 26 In his brief, Appellant sets forth the following issue for our review: "Did the lower court err by refusing to instruct the jury on the 'prompt complaint' doctrine, where [Appellant] denied that any sexual assault occurred?" Brief for Appellant at 4. Specifically, Appellant contends P.H. did not complain about an attack at the first opportunity available to her, in that upon her return home, she walked past her mother and did not seek counsel from her grandmother, but instead chose to have a conversation with her "like-aged cousin." Brief for Appellant at 13.

¶ 27 Our legislature has addressed the need for a victim of an attack to provide prompt reporting as follows:

Prompt reporting to public authority is not required in a prosecution under this chapter: Provided, however, [t]hat noth-

14. 42 Pa.C.S.A. § 9541–9546.

ing in this section shall be construed to prohibit a defendant from introducing evidence of the complainant's failure to promptly report the crime if such evidence would be admissible pursuant to the rules of evidence.

18 Pa.C.S.A. § 3105.

¶ 28 "[I]n reviewing a challenge to the trial court's refusal to give a specific jury instruction, it is the function of this [C]ourt to determine whether the record supports the trial court's decision." *Lockhart v. List,* 542 Pa. 141, 147, 665 A.2d 1176, 1179 (1995). In examining the propriety of the instructions a trial court presents to a jury, our scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. *Boutte v. Seitchik,* 719 A.2d 319, 324–325 (Pa.Super.1998). A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. *Potochnick v. Perry,* 861 A.2d 277, 283 (Pa.Super.2004). A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions. *Atwell v. Beckwith Machinery Co.,* 872 A.2d 1216, 1222 (Pa.Super.2005); *Angelo v. Diamontoni,* 871 A.2d 1276, 1279 (Pa.Super.2005). The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the Appellant was prejudiced by that refusal. *Commonwealth v. Newman,* 382 Pa.Super. 220, 555 A.2d 151, 158–159 (1989).

It has been said that 'hue and cry follow rape like smoke follows fire.' The presumption follows that if a complaint is made promptly after the alleged offense, the victim has not had time to fabricate the story and the story is given more credibility. Conversely, if a complaint is delayed substantially without any reasonable explanation, an inference can be drawn regarding the credibility of that complaint and against whether the incident in fact occurred.

*Commonwealth v. Snoke,* 525 Pa. 295, 300, 580 A.2d 295, 297 (1990).

¶ 29 The prompt complaint instruction is based upon a belief that a victim of a violent assault would reveal the assault occurred at the first available opportunity. *Commonwealth v. Snoke,* 525 Pa. 295, 300, 580 A.2d 295 297 (1990); the purpose of the instruction is to allow a jury to call into question a complainant's credibility when he or she did not complain at the first available opportunity. *Commonwealth v. Prince,* 719 A.2d 1086, 1091 (Pa.Super.1998).

¶ 30 The propriety of a prompt complaint instruction is determined on a case-by-case basis pursuant to a subjective standard based upon the age and condition of the victim. For example, where the victim of a sexual assault is a minor who "may not have appreciated the offensive nature of the conduct, the lack of a prompt complaint would not necessarily justify an inference of fabrication." *Commonwealth v. Jones,* 449 Pa.Super. 58, 66 n. 2, 672 A.2d 1353, 1357 n. 2 (1996). This is especially true where the perpetrator is one with authority or custodial control over the victim. *Commonwealth v. Ables,* 404 Pa.Super. 169, 183, 590 A.2d 334, 340 (1991), *appeal denied,* 528 Pa. 620, 597 A.2d 1150 (1991). Similarly, if the victim suffers from a mental disability or diminished capacity, a prompt complaint instruction may not be appropriate. *Commonwealth v. Bryson,* 860 A.2d 1101, 1104–1105 (Pa.Super.2004).

¶ 31 Herein, an examination of the instruction the trial court provided to the jury as a whole reveals that the omission of a prompt complaint instruction did not amount to fundamental error, nor did the absence of that charge prejudice Appellant. The jury was instructed regarding the credibility of all witnesses, including the victim and Appellant. (N.T., 6/20/03, at 125–131). As such, we believe that under the facts of this case, the instruction enabled the jury to ascertain the credibility of P.H.'s testimony as well as that provided by the others who testified in this matter.

¶ 32 P.H. was a minor on June 26, 2002. Upon entering her home only moments after she was raped, P.H. passed her sleeping mother, picked up her portable phone and immediately proceeded to her basement, where she called Ms. Evangelopoulos and divulged the traumatic course of events she had just endured. P.H.'s choice not to talk to her sleeping mother is understandable, especially in light of her testimony that the boys indicated to her they knew where she lived, which Appellant perceived as a threat to her family's safety. In addition, within minutes of seeing her mother, P.H. revealed the attack to her cousin and best friend; her decision to do so is understandable considering she was a young woman who had just been traumatized and threatened. The next day, as soon as P.H.'s aunt and mother were made aware of the situation, the police were notified and P.H. submitted to an interview and a rape kit within the next few hours.

¶ 33 Appellant theorizes that P.H. failed to promptly report the rape because she did not tell the first person whom she saw, her sleeping mother; this argument, is a misapplication of the law in that prompt reporting does not require a revelation to the first person one sees after his or her attack; within moments of walking in her home, Appellant called her cousin and met with Detective Graff within twenty four hours of the attack. This behavior satisfies the promptness requirement and thus renders a jury instruction regarding it unnecessary.

¶ 34 Judgment of sentence affirmed.