J-S10029-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TIMOTHY LOROWN JOHNSON | : | |
| | : | |
| Appellant | : | No. 1330 MDA 2021 |

Appeal from the Judgment of Sentence Entered July 22, 2021
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0005481-2019

BEFORE:   MURRAY, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY McLAUGHLIN, J.:      **FILED: JULY 1, 2022**

Timothy Lorown Johnson appeals from the judgment of sentence imposed following his conviction for terroristic threats. **See** 18 Pa.C.S.A. § 2706(a)(1). Johnson argues the court erred in admitting Facebook posts without proper authentication and in not instructing the jury on the principles of transitory anger. We affirm.

Johnson was arrested in September 2017, following an argument with his brother Larry Johnson ("Larry"). The trial court summarized the evidence presented at trial as follows:

> Evidence presented by the Commonwealth demonstrated that on September 16, 2017, [Johnson] and . . . Larry . . . became involved in an argument over money. According to Larry's testimony, the argument began inside Larry's home, and culminated with [Johnson] retreating to his car in the driveway of the home and Larry retreating to his front yard

---

[*] Retired Senior Judge assigned to the Superior Court.

to do some work. At some point while Larry was in the front yard and [Johnson] was in his car, Larry could hear [Johnson] talking on the phone with someone, and Larry stated while on the phone that he would "kill everybody in this house." Sometime thereafter, Larry received a series of phone calls from friends and family members to alert him to various threatening messages that [Johnson] had posted on Facebook. Larry read the Facebook posts himself and then went to a neighbor's house to call 911.

Based on Larry's 911 call, Swatara Township Police were dispatched to his home. Initially responding to the scene were Officer Tyler Margeson, Officer Adam Leitzell, and Corporal Timothy Bloss, all who testified at trial. Upon the officers' arrival at approximately 4:30 p.m., Larry was standing at the end of his driveway waiting for the officers to arrive, and there was a red Ford Escape parked in the driveway. Larry conveyed to Officer Leitzell that [Johnson] was inside the vehicle with a knife. Larry stated to the officer that [Johnson] was from Indianapolis and that he had moved in with Larry about 10 months prior. Officer Leitzell, Officer Margeson, and Corporal Bloss then approached the Ford Escape and observed [Johnson] sitting in the driver's seat drinking a glass of whiskey and smoking a cigarette. After several attempts to gain his attention, [Johnson], who appeared agitated and intoxicated, lowered the driver's side window. Officer Margeson observed a bottle of Jack Daniels whiskey on the passenger's seat, and he saw the handle of a knife on the passenger side floorboard, jammed in between the seat and the center console.

While [Johnson] remained in the car, Officer Margeson began conversing with [Johnson]. [Johnson] relayed that he had been living at Larry's house for about 10 months and that during that time frame, [Johnson] had performed construction work on the house. [Johnson] told the officer that he and Larry got into an argument over money that Larry allegedly owed [Johnson] for the construction work, and Larry asked [Johnson] to leave the house. According to Officer Margeson, throughout the course of his conversation with [Johnson], [Johnson] repeatedly stated that he was going to stab Larry and that he "understood why Kane [sic] killed Abel." Although [Johnson] did not make this statement to Larry directly, Officer Margeson recalled that Larry was standing at the base of the driveway and would

have been able to clearly hear what [Johnson] said. [Johnson] admitted that he had a knife in his car, and he said that he had just sharpened it a week earlier so he knew it would be an effective weapon. During his conversation with Officer Margeson, [Johnson's] tone fluctuated. When talking about stabbing Larry, [Johnson] was screaming at the top of his lungs, but intermittently, [Johnson] would calm down and express how much he loved Larry.

While Officer Margeson was speaking with [Johnson] at the vehicle, Officer Leitzell retreated to the garage to speak with Larry and ask him about how the events of the day had transpired. Larry told Officer Leitzell that he was frustrated with [Johnson] for failing to hold a job and contribute to household bills, and because of this, he had told [Johnson] that he had to leave the house. Larry told the officer that when he asked [Johnson] to leave, [Johnson] demanded money, to which Larry responded by throwing $200 at [Johnson]. [Johnson] threw the money back at Larry, saying that it was not enough. According to Larry, he and [Johnson] then started to argue, and [Johnson] went and retrieved a knife and threatened to stab Larry. At some point during the argument, [Johnson] ran to his car, which is where he remained when officers arrived. During his conversation with Officer Leitzell, Larry pulled up a Facebook page which he represented to be [Johnson's] and showed the officer four threatening Facebook posts purportedly written by [Johnson] on [Johnson's] Facebook page. Officer Leitzell wrote down the text of those four posts verbatim in his police report. According to Officer Leitzell's report, the first post said: "Do you want to witness a murder on TV? Where he goes?" The second post stated: "I'll kill all y'all. Don't fuck with me." The third post read: "I'm going to stick this knife straight through his heart. I can understand why I can't killed Abel." The fourth post said: "Give me - give me ya'll, forgive me right now I think I'm about to kill my brother. Yeah, I'm drinking, but I'm not drunk and I know what it's like to be fucked over."

After Larry showed Officer Leitzell the Facebook posts, Officer Leitzell eventually returned to [Johnson's] car alongside Officer Margeson, and they engaged in a discussion about where [Johnson] could stay since Larry was ejecting him from the house. They discussed contacting [Johnson's] uncle, and [Johnson] was advised that he could

use Officer Margeson's patrol phone to call his uncle. At that point, [Johnson] exited his car and was taken into custody. A search of the vehicle recovered the knife and whiskey bottle that Officer Margeson had observed when initially approaching the vehicle.

Trial Court Opinion, filed Dec. 8, 2021, at 2-4 (citations to record omitted).

Prior to and during trial, Johnson objected to the authentication of the Facebook posts. N.T., July 20, 2021, at 5; 56-59; 94-96. The court overruled the objection. ***Id.*** at 96.

Johnson also submitted proposed jury instructions, including an instruction that a person does not possess intent to terrorize based on spur-of-the-moment threats:

> However, in considering whether the defendant actually possessed the a crime of violence with [sic] the intent to terrorize Larry Johnson, you must be guided in your consideration by the principal that one possesses the intent to terrorize when one makes threats which seriously impair personal security or is intended to put one into a state of "extreme fear" or "emotional despair". ***One does not possess the intent to terrorize by mere spur-of-the-moment threats which result from anger.***

Defendant's Proposed Jury Instructions, filed July 20, 2021, at 8 (emphasis added). The court did not include the proposed instruction in the final jury instructions. Counsel again raised the issue with the trial court at sidebar[1] following the charge and after the jury verdict. N.T., July 20, 2021, at 177.

---

[1] This sidebar was not transcribed, but after the verdict, Johnson's counsel noted that they discussed the instruction at sidebar and preserved her objection, and neither the trial court nor the Commonwealth dispute this. N.T., July 20, 2021, at 177.

The jury found Johnson guilty of terroristic threats and not guilty of simple assault (attempts by physical menace to put another in fear of imminent serious bodily injury), 18 Pa.C.S.A. § 2701(a)(3). The trial court sentenced Johnson to 18 months' county probation. Johnson filed a post-sentence motion, which the trial court denied. Johnson filed a timely notice of appeal.

Johnson raises the following issue:

> 1. In a prosecution for terroristic threats, did not the trial court err in admitting various social media communications and related testimony when the Commonwealth failed to authenticate such evidence under Pa.R.E. 901 by establishing [Johnson's] authorship of such communications?

> 2. Did not the court err in refusing to instruct the jury that the charge of terroristic threats at 18 Pa.C.S.A. § 2706 does not encompass "mere spur-of-the-moment threats which result from anger," a principle explicitly set forth in the official comment to 18 Pa.C.S.[A.] § 2706?

Johnson's Br. at 5.

In his first issue, Johnson argues the court erred in overruling his objection to the introduction of the Facebook posts, which he alleges were inadmissible because the Commonwealth failed to authenticate the posts. He claims this Court has acknowledged the difficulty in authenticating electronic communications, as more than one person can use an email address or account, social media accounts may be falsified, and a legitimate account may be accessed by another. *Id.* at 21. He notes there must be sufficient evidence of authorship of the messages offered into evidence. He claims that here there

was no direct evidence that Johnson authored the posts and no witnesses testified that he admitted to being the author. Further, "there [was] a dearth of 'contextual clues' that prove the identity of the author," as he alleges the posts do not appear to be in response to a particular event on a particular date or incorporate unique facts about the event, and the posts do not reference the events that purportedly triggered the threats. *Id.* at 24.

A ruling on the admissibility of evidence is "committed to the [trial] court's discretion and will only be reversed on appeal where there is an abuse of discretion." *Commonwealth v. Rogers*, 250 A.3d 1209, 1215 (Pa. 2021). "An abuse of discretion occurs when the law is overridden or misapplied, or the judgment exercised was either manifestly unreasonable or the product of partiality, prejudice, bias, or ill will." *Id.*

In general, "to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a). For digital evidence, including social media posts, the proponent must connect the digital evidence with the person through direct or circumstantial evidence:

> (11) *Digital Evidence*. To connect digital evidence with a person or entity:
>
> (A) direct evidence such as testimony of a person with personal knowledge; or
>
> (B) circumstantial evidence such as:
>
>     (i) identifying content; or

> > (ii) proof of ownership, possession, control, or access to a device or account at the relevant time when corroborated by circumstances indicating authorship.

Pa.R.E. 901(b)(11) and comment.[2]

Importantly, "[t]he proponent of digital evidence is not required to prove that no one else could be the author. Rather, the proponent must produce sufficient evidence to support a finding that a particular person or entity was the author." *Id.* at comment. Circumstantial evidence sufficient to authenticate digital evidence "may include self-identification or other distinctive characteristics, including a display of knowledge only possessed by the author." Pa.R.E. 901 at comment. Moreover, "[c]ircumstantial evidence of ownership, possession, control, or access to a device or account alone is insufficient for authentication," but such evidence may be enough "in combination with other evidence of the author's identity." *Id.* The authentication of digital messages "turns upon the depth of direct and circumstantial evidence of authorship marshaled by the proponent" of the messages. *Commonwealth v. Orr*, 255 A.3d 598, 601 (Pa.Super. 2021).

In *Commonwealth v. Koch*, 39 A.3d 996 (Pa.Super. 2011), *affirmed by equally divided court*, 106 A.3d 705 (Pa. 2014), the trial court found the Commonwealth presented sufficient evidence to authenticate text messages as being sent by the appellant. There, a police detective testified he

---

[2] Pa.R.E. 901(b)(11) became effective on October 1, 2020. It is consistent with the case law addressing authentication of digital evidence that existed at the time of its enactment. *See Commonwealth v. Orr*, 255 A.3d 598, 601 n.3 (Pa.Super. 2021).

transcribed the text messages, but "acknowledged that he could not confirm that [the a]ppellant was the author of the text messages and that it was apparent that she did not write some of the messages." *Id.* at 1005. We concluded the court erred, reasoning "the detective's description of how he transcribed the text messages, together with his representation that the transcription was an accurate reproduction of the text messages on [the a]ppellant's cellular phone, is insufficient for purposes of authentication where the Commonwealth concedes that [the a]ppellant did not author all of the text messages on her phone." *Id.* We noted that "[g]laringly absent in this case is any evidence tending to substantiate that [the a]ppellant wrote the drug-related text messages" and there was no "contextual clues in the drug-related text messages themselves tending to reveal the identity of the sender." *Id.*

In subsequent cases, this Court has found electronic messages properly authenticated where contextual clues in the messages connected them to the defendant, but found messages inadmissible where no evidence connected the defendant to the device, account, or messages. *Compare e.g., Orr*, 255 A.3d at 601 (finding text messages authenticated where it was the defendant's phone and the messages referenced a domestic custody dispute between himself and the recipient of the messages); *Commonwealth v. Murray*, 174 A.3d 1147, 1157 (Pa.Super. 2017) (finding messages authenticated where phones were in the defendant's possession and the messages' content, "regarding the sender's expectation that he might be getting locked up that day, and alluding . . . to an item taken from the bully, is consistent with the

events and chronology of [the defendant] being ordered to report to his parole agent" earlier that day and the defendant's description of the incident where he acquired the gun), *with, e.g., Commonwealth v. Mangel*, 181 A.3d 1154, 1164 (Pa.Super. 2018) (finding Facebook posts and messages not authenticated where there was no evidence the defendant created the Facebook account, authored the chat messages, or posted the photograph of bloody hand and there were no contextual clues in the chat messages that identified the defendant as the sender of the messages); *Commonwealth v. Mosley*, 114 A.3d 1072, 1183 (Pa.Super. 2015) (finding the messages not authenticated, reasoning "there is no evidence, direct or circumstantial, tending to substantiate that Mosley was the author of the drug-related text messages," "no testimony was presented from persons who sent or received the text messages," and although "there may be contextual clues with regard to some texts, (i.e., one of the text messages is from Mosley's mother on July 26, 2012, just 18 days before his arrest, wishing Mosley a happy birthday), there are no such clues in the drug-related texts messages themselves tending to reveal the identity of the sender").

Here, the trial court found the Facebook posts admissible, reasoning that authorship by Johnson was established through contextual clues in the four messages:

> In the instant matter, we believe that there is sufficient circumstantial evidence and contextual clues in the subject threatening Facebook posts, especially the third and fourth posts, which tend to reveal the identity of the author as [Johnson]. The third Facebook post, read by Officer Leitzell

on the witness stand, stated: "I'm going to stick this knife straight through his heart. I can understand why I can't kill Abel." This language is entirely consistent with the words and actions of [Johnson] at the time that officers encountered him on the date in question. Specifically, in his encounters with the officers, [Johnson] repeatedly utilized the same Cain and Abel reference that is used in the third Facebook post. Moreover, the threat in the Facebook post to "stick this knife straight through his heart" is consistent with [Johnson's] other threats to stab his brother on the date in question.

The fourth Facebook post contains similar contextual clues suggesting that [Johnson] is the author of the post. That post read: "Give me - give me ya'll, forgive me right now I think I'm about to kill my brother. Yeah, I'm drinking, but I'm not drunk, and I know what it's like to be fucked over." As can be seen, the fourth Facebook post again contains a reference to killing the author's brother, which is consistent with [Johnson's] other threats towards his brother on the date in question. Moreover, the fourth post contains a reference to drinking and a reference to being "fucked over." The reference to drinking is consistent with the officer's observations of [Johnson] on the date in question, as [Johnson] was observed to be drinking whiskey when the officers approached him in his car. As for the Facebook post's reference to the author being "fucked over", this is consistent with the fact that on the date in question, [Johnson] believed that he was being wronged by being kicked out of Larry's house and by not being paid enough money for the construction work that he did on the house. Thus, because there was sufficient circumstantial evidence and contextual clues in the subject Facebook posts to establish [Johnson] as the author of the posts, this Court did not err in allowing the text of these posts to be introduced into evidence through the recitation of Officer Leitzell.

1925(a) Op. at 6-7.

The trial court did not abuse its discretion in concluding the circumstantial evidence sufficiently established Johnson was the author of the

Facebook posts. Unlike in **Koch** and subsequent cases where the Commonwealth presented no or insufficient evidence of authorship, here Johnson's language used in his conversations with police officers on the day in question mirrored the language used in the Facebook posts. The court's decision was not manifestly unreasonable or the product of partiality, prejudice, bias, or ill will. **See Rogers**, 250 A.3d at 1215.

In his second issue, Johnson argues the court erred in refusing to instruct the jury on the principles of transitory anger, alleging that the terroristic threats statute "is not intended to penalize 'mere spur-of-the-moment' threats which result from anger." Johnson's Br. at 17 (quoting 18 Pa.C.S.A. § 2706, official comment). He argues the proposed instruction included citation to four cases in support and was included in the comment to the statute. He claims that because the jury charge did not include the transitory anger principle, it was error. He disputes the trial court's determination that there was no basis to characterize the behavior as transitory. According to Johnson, no testimony pinpointed the timing of the Facebook posts to the statement Larry heard while mowing the lawn, and they "all could have occurred within less than a minute." **Id.** at 28.

When reviewing a trial court's decision regarding jury instructions, we will reverse only where the court abused its discretion or committed an error of law. **Commonwealth v. Cannavo**, 199 A.3d 1282, 1286 (Pa.Super. 2018). This Court's "key inquiry is whether the instruction on a particular issue adequately, accurately and clearly presents the law to the jury, and is

- 11 -

sufficient to guide the jury in its deliberations." ***Id.*** (quoting ***Commonwealth v. Hamilton***, 766 A.2d 874, 878 (Pa.Super. 2001)). Further, "[t]he trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the Appellant was prejudiced by that refusal." ***Commonwealth v. Sandusky***, 77 A.3d 663, 667 (Pa. Super. 2013) (quoting ***Commonwealth v. Thomas***, 904 A.2d 964, 970 (Pa. Super. 2006)). Where the trial court's instructions track the Pennsylvania Suggested Standard Criminal Jury Instructions, it is presumed such instructions are an accurate statement of the law. ***See Commonwealth v. Kerrigan***, 920 A.2d 190, 198  (Pa.Super. 2007).

The crime of terroristic threats occurs where a "person communicates, either directly or indirectly, a threat to . . . commit any crime of violence with intent to terrorize another[.]" 18 Pa.C.S.A. § 2706(a)(1).

The trial court issued the following jury instruction on terroristic threats:

> And the first is terroristic threats. And I know the title of the charge sort of gives you a certain impression but, nevertheless, there are details here that the statute covers.
>
> The defendant has been charged with the offense of terroristic threats. To find defendant guilty of this offense you must find the following elements have been proven beyond a reasonable doubt:
>
> First, that the defendant communicated, either directly or indirectly, a threat which was received by the victim. The term communicates means that it is conveyed in person or by written or electronic means, including telephone, email, internet, et cetera. In other words, communication can be done by words or deeds conveyed in any manner. A present ability to inflict harm is not required. There is no requirement that the harm will actually be carried out.

> The second element is that the defendant communicated the threat to commit a crime of violence with the intent to terrorize another. Under the statute prohibiting terroristic threats it is unnecessary for an individual to specifically articulate the crime of violence that he or she intends to commit, or the type of crime may be inferred from the nature of and the context of or the circumstances surrounding -- surrounding the utterance as stated, and thus, direct communication between the defendant and the victim is not required to establish the crime of terroristic threats.

N.T., July 20, 2021, at 145-46. This language was almost identical to the Pennsylvania Suggested Standard Jury Instructions for a terroristic threat charge. **See** Pa. Sug. Stand. Crim. Jury Inst. at § 15.2706.

The trial court found the "charge, as a whole, clearly, adequately, and accurately instructed the jury as to the law on the requisite elements of the offense of Terroristic Threats." 1925(a) at 8. It further noted that, because it tracked the standard instruction, it was presumed to be accurate. The court further concluded that the failure to include the transitory anger instruction was not prejudicial because "evidence presented at trial was sufficient to allow a jury to find, beyond a reasonable doubt, that [Johnson] possessed the intent to terrorize Larry and that his words constituted more than a 'spur-of-the-moment' threat resulting from transitory anger." **Id.** at 9. It noted the evidence suggested that from the time Johnson and Larry started arguing until the police took Johnson into custody hours later, Johnson made threats on Larry's life "both verbally in earshot of Larry, and in a sustained series of social media posts." **Id.**

The trial court did not abuse its discretion when instructing the jury as to terroristic threats. The instruction used language that closely tracked the standard instruction, and therefore is presumed accurate. Further, the instruction clearly, adequately, and accurately instructed the jury as to the elements of the crime. The decision whether to include a transitory anger charge was within the court's discretion, and its decision to not issue such a charge was not an abuse of that discretion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/1/2022