J-A15024-24

2024 PA Super 232

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                     : PENNSYLVANIA
                                     :
                 v.                  :
                                     :
                                     :
JERROD AARON SCOTT                   :
                                     :
              Appellant              : No. 1247 MDA 2023

Appeal from the Judgment of Sentence Entered June 1, 2023
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0000858-2021

BEFORE:   DUBOW, J., BECK, J., and STEVENS, P.J.E.*

OPINION BY BECK, J.:                          **FILED OCTOBER 01, 2024**

Jerrod Aaron Scott ("Scott") appeals from the judgment of sentence imposed following his convictions, in relevant part, of drug delivery resulting in death ("DDRD") and possession with intent to deliver ("PWID") by the York County Court of Common Pleas ("trial court").[1] Scott argues that the evidence was insufficient to prove that he delivered the drugs to Zack Savage ("Savage") that caused Savage's overdose death. Alternatively, he contends that the trial court abused its discretion by denying his request to instruct the jury that acquisition and possession of drugs may be constructive and joint. Following our careful consideration of his arguments, we affirm.

---

* Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2506(a); 35 P.S. § 780-113(a)(30).

The trial court accurately summarized the facts surrounding Savage's overdose death:

In the week preceding June 28, 2019, Melissa Wandell ("Wandell") and Savage made arrangements for Savage to pick up Wandell and take her [to Harrisburg] to buy heroin from Wandell's drug dealer named Ro-Ro. [Their plan was for Wandell to give Savage some Klonopin and Vyvanse, two medications that she was prescribed, and for Savage to pay for the heroin that they would share.] On Friday, June 28, 2019, around 11:10 a.m., Savage arrived at Wandell's house. In the time leading up to Savage's arrival, Wandell called Ro-Ro's phone number multiple times. At some point, an individual identifying himself as "J", later identified as Scott, answered the phone and indicated [that] Ro-Ro is his mom. Ro-Ro was unavailable but Scott indicated that he could get the drugs if Wandell could pick him up at Hershey Medical Center.

Savage and Wandell drove to Hershey and picked up Scott. Savage supplied money and gave it to Wandell to hold. … Scott got in the back seat behind Wandell, … told the occupants [that] they needed to go to Harrisburg and gave Savage driving directions. Upon arriving in Harrisburg, Savage drove to a convenience store where Scott made contact with an unknown individual [inside the store before the individual and Scott] got into the back seat of Savage's car. Scott gave the individual the money, provided by Wandell and Savage, in exchange for fentanyl which Scott then handed to Wandell. The unknown individual exited the vehicle and the trio proceeded to another location, with Scott giving Savage directions. At the next stop, Scott purchased crack cocaine [that Wandell had asked Scott to obtain]. [Details regarding the logistics of this transaction are largely absent from the record]. Savage then drove to a third and a fourth location so [that] Scott could pick up a prescription for Suboxone then have that prescription filled at Rite Aid. [Savage and Wandell used crack cocaine in the car while they were waiting for Scott to obtain his Suboxone prescription]. Scott then traded the Suboxone for heroin at yet another location to which he provided direction[s] to Savage. Scott and Wandell used the crack cocaine in the car while Savage was driving.

At approximately 7:00 p.m., Scott, Wandell, and Savage drove to Martin Luther King Memorial Park, in Harrisburg, to get

- 2 -

high. Upon arriving at the park, the trio parked and walked to a more secluded area. Wandell carried a 'kit' containing a spoon, a syringe and a tie as well as the drugs for herself and Savage; Scott carried his own drugs. Scott and Wandell ingested [fentanyl] and Scott overdosed. Savage obtained Narcan from the car and used it on Scott. While Scott recovered, Savage ingested two bags of the [fentanyl] and passed out. Scott carried Savage back to the car[, and put] him down at one point, allowing Savage to fall backwards and hit his head on the pavement. Eventually, Scott and Wandell got Savage into the car and placed him in the back seat, propping him up with Savage's bookbag.

At approximately midnight, Wandell drove from the park to a convenience store in the hopes of getting water for Savage. The store was closed and they continued on to Berryhill so Scott could obtain crack, then went to Wandell's apartment in Dillsburg, York County. Savage was passed out in the backseat.

Upon arriving at her home, Wandell checked on Savage then went into her room with Scott to ingest more drugs. Once finished taking the drugs, Wandell and Scott went outside and again checked on Savage. Savage was in the same place, alive but still passed out. Wandell checked on Savage three or four times before falling asleep on the porch around 2:30 a.m. No one called 911 or sought help for Savage. At some point, Wandell's mother woke her to go inside to bed. Wandell checked on Savage one more time then went inside with Scott and went to bed. When checking on Savage, Wandell testified that she felt for a pulse and checked that he was breathing.

The next morning, Wandell took the remaining fentanyl, then left for her appointment at the methadone clinic. She looked in on Savage and thought he looked fine and thought she felt a pulse. Wandell was gone for approximately forty minutes. When she returned, Wandell again looked in on Savage. Wandell's mother indicated that he did not look right and Wandell could not find a pulse. Emergency services were contacted and both the police and paramedics dispatched with reports of an unconscious male. Upon arrival, CPR was performed on Savage and an attempt was made to administer Narcan. However, it was determined that Savage was deceased. A subsequent autopsy indicated Savage had antemortem contusions and abrasions to the scalp and face indicative of blunt force trauma. Further, there were hemorrhages in the subarachnoid spaces that did not

completely match the external injuries. [The metabolites found in Savage's tissue and fluids indicated that he had used Klonopin, marijuana, and cocaine prior to his death, as well as fentanyl at toxic levels.] The cause of Savage's death was determined to be mixed substance toxicity.

Trial Court Opinion, 1/25/2024, at 1-6 (record citations omitted; names modified).

After investigating Savage's death, police charged Scott with DDRD and PWID, as well as third-degree murder, access device fraud, theft, receiving stolen property, and evidence tampering. The trial court conducted a three-day trial wherein the jury heard the above evidence concerning Scott's role in Savage's overdose death.

After the parties rested, the trial court conducted a charge conference during which Scott's counsel requested that the trial court instruct the jury on joint use and acquisition of drugs. Defense counsel argued that as addicts who planned to acquire and use drugs together, Scott, Savage, and Wandell had joint and simultaneous possession, and as such, Scott did not deliver drugs to Savage. N.T., 3/27-30/2023, at 406, 409, 459-66. Scott's argument was premised upon **Commonwealth v. Brown**, 798 WDA 2022, 2023 WL 3222860 (Pa. Super. Apr. 28, 2023) (non-precedential decision), and **United States v. Semler**, 858 Fed. Appx. 533 (3d. Cir. 2021), an unpublished federal case. The trial court declined to issue the instruction, expressing doubt that the facts supported a finding that the three were joint users. N.T., 3/27-30/2023, at 466. Moreover, the trial court opined that while the law may

- 4 -

follow the rationale of **Brown** and **Semler** eventually, at the time of trial there was no precedential appellate law in Pennsylvania establishing that there could not be a delivery between people using drugs together. **Id.** Instead, the trial court instructed the jury on delivery as follows:

> The term deliver includes the actual or constructive transfer from one person to another of the controlled substance. It does not require the transfer to involve profit or the exchange of money. Rather, the transfer need only involve the conveyance of a controlled substance. A delivery may take place between two persons even though one of them is acting as agent for the other.

**Id.** at 561.

The jury found Scott guilty of DDRD, PWID, and several other crimes not pertinent to this appeal. The jury found Scott not guilty of third-degree murder and tampering with evidence. On June 1, 2023, the trial court imposed an aggregate sentence of seven to nineteen years of incarceration, followed by one year of probation. Scott filed a post-sentence motion, which the trial court denied.

Scott filed a timely notice of appeal. Both Scott and the trial court complied with Rule 1925 of the Pennsylvania Rules of Appellate Procedure. Scott asks this Court to decide whether the jury's guilty verdicts for DDRD and PWID were supported by sufficient evidence, arguing that the Commonwealth failed to prove that Scott delivered the drugs to Savage that led to his death. Scott's Brief at 5. Alternatively, Scott contends that the trial court erred by not instructing the jury regarding joint use and acquisition of drugs. **Id.**

**<u>Sufficiency of the Evidence</u>**

We review Scott's challenge to the sufficiency of the evidence supporting his convictions according to the following standard:

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is de novo and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the [factfinder] to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the [factfinder].

***Commonwealth v. Rosario***, 307 A.3d 759, 764-65 (Pa. Super. 2023) (citation omitted).

In relevant part, section 13(a)(30) of the Controlled Substance, Drug, Device and Cosmetic Act ("Drug Act"), commonly known as PWID, prohibits a person not registered under the Drug Act from engaging in "manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance." 35 P.S. § 780-113(a)(30).[2]

---

[2] Act of April 14, 1972, P.L. 233, No. 64, § 13, as amended.

A person commits the crime of DDRD when (1) he "intentionally administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled substance"; (2) such act violates section 13(a)(14) or (30) of the Drug Act;[3] and (3) "another person dies as a result of using the substance." *See* 18 Pa.C.S. § 2506(a); *see also Commonwealth v. Peck*, 242 A.3d 1274, 1281 (Pa. 2020).

To establish DDRD, the Commonwealth need not prove that the defendant intended to cause the death of another. *See Commonwealth v. Kakhankham*, 132 A.3d 986, 993 (Pa. Super. 2015). Instead, the Commonwealth must establish that the defendant's act of administering, dispensing, delivering, giving, prescribing, selling, or distributing the substance was intentional and that the defendant had a "reckless disregard of death from the use of the contraband." *Commonwealth v. Carr*, 227 A.3d 11, 17 (Pa. Super. 2020). A defendant acts recklessly when he

> consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b)(3). Given the inherent dangerousness of consuming fentanyl in an unknown strength and the high possibility that death could

---

[3] Section 13(a)(14), relating to medical practitioners, is not applicable to the instant case.

occur, the Commonwealth "satisfies the reckless element as to the possibility of death" when the substance involved is fentanyl. *See Commonwealth v. Storey*, 167 A.3d 750, 758 (Pa. Super. 2017) (holding that the intentional sale of heroin to a person, the use of which caused the death of a third person unknown to the defendant, constitutes recklessness for the purpose of DDRD). The statute requires "but-for" causation such that the defendant's action with the drugs was a "direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result," so long as the defendant's actions were not "so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible." *Commonwealth v. Proctor*, 156 A.3d 261, 271 (Pa. Super. 2017); *see also* 18 Pa.C.S. § 303(a).

In his challenge to the sufficiency of the evidence, Scott specifically disputes that the Commonwealth proved that he "delivered" the drugs to Savage. Scott's Brief at 24. Instead, he argues that the three addicts—Scott, Waddell, and Savage—mutually planned to acquire drugs from Scott's contacts and use the drugs together. *Id.* at 28. Scott urges this Court to

follow the rationale of **Brown**,[4] and cases from federal and other state courts[5]

and find that, based upon their mutual plan to acquire and use drugs together,

---

[4]  **Brown** is a split non-precedential decision authored by President Judge Emeritus Bender affirming the pretrial dismissal of DDRD charges against Brown, who, along with the decedent, had acquired and used the heroin that ultimately killed the decedent.  This Court affirmed based upon the Commonwealth's failure to preserve its issue for appellate review.  **Brown**, 2023 WL 3222860 at *2.  President Judge Emeritus Bender alternatively affirmed the trial court's finding that Brown and the decedent jointly constructively possessed the drugs from the outset as co-users with a plan to obtain drugs for joint personal use.  **Id.** at **3-10.  Although Brown physically obtained the drugs from her personal contact outside the decedent's presence before sharing the drugs with the decedent, President Judge Emeritus Bender agreed with the trial court that Brown could not have transferred possession of the drugs to the decedent when the decedent already possessed the drugs. **Id.**  at **9-10.  **Brown**, however, is non-precedential, both because it is unpublished and because President Judge Emeritus Bender's reasoning did not garner a majority.  **See E.C.S. v. M.C.S.**, 256 A.3d 449, 456 (Pa. Super. 2021) (noting that, pursuant to 210 Pa. Code.  65.37, unpublished decisions are not binding precedent); **Estate of Agnew v. Ross**, 110 A.3d 1020, 1026 n.6 (Pa. Super. 2015) ("Unless an issue in a panel decision commands a majority both as to result and as to rationale, the principle embodied in the issue is not precedential."), **rev'd on other grounds**, 152 A.3d 247 (Pa. 2017).  Judge Kunselman concurred in the result only without explanation.  Senior Judge Colins concurred as to President Judge Emeritus Bender's waiver finding, but otherwise dissented on the merits.

[5]  For example, Scott again relied upon **Semler**, an unpublished federal case wherein the Court of Appeals for the Third Circuit interpreted the term "distribute" in the Federal Controlled Substances Act, 21 U.S.C. § 841, as incorporating concepts of possession and control.  **See Semler**, 858 Fed. Appx. at 538-39.  The court declined to interpret the statute in a "hyperliteral" fashion because it would turn any physical handoff of drugs into a felony distribution, which would divert punishment from traffickers to end users sharing small amounts of drugs socially.  **Id.**

Notably, in a lengthy concurring and dissenting opinion, the Honorable David J. Porter contended that the statute did not provide an exemption for "joint purchasers or distribution among 'friends,'" and critiqued the majority, inter
*(Footnote Continued Next Page)*

Scott did not "deliver" the drugs within the meaning of PWID and DDRD. **See**

**id.** at 19, 22-34. Instead of focusing upon the language of the statute in

question, Scott implores this Court to consider that each "addict had equity in

the efforts to obtain drugs: Savage contributed funds and his vehicle, Wandell

contributed her contact with Scott's mother, 'Ro Ro,' and Scott contributed his

knowledge of where to get drugs in furtherance of their 'plan.'" **Id.** at 37.

From Scott's perspective, the plan between co-users should be determinative

of whether they jointly acquired possession or whether one delivered drugs to

the other. **Id.** Scott emphasizes that Savage drove the trio to get the drugs,

paid for the drugs, and was present in the car when Scott bought the drugs

from his connections. **Id.** at 29. Scott argues that the case would be different

if Scott sold Wandell and Savage the drugs and then everyone parted ways,

but because Scott "joined the party" and "expressly or impliedly … became a

part of Wandell and Savage's original agreement and plan to jointly acquire

and use drugs together," the Commonwealth failed to meet its burden on the

element of delivery element. **Id.** at 36. In short, Scott contends that the

evidence was insufficient to support his convictions because he acted as a

personal joint user, not a drug dealer. **See id.** at 36.

---

alia, for failing to abide by the plain language of the statute in favor of its own policy analysis. **Id.** at 543-55 (Porter, J., concurring and dissenting). Noting that the majority relied upon **United States v. Swiderski**, 548 F.2d 445, (2d. Cir. 1977), for its conclusion, Judge Porter analyzed cases from various jurisdictions and decried **Swiderski** as an "extreme outlier." **Semler**, 858 Fed. Appx. at 551-54 (Porter, J., concurring and dissenting).

Significantly, the Drug Act defines "deliver" and "delivery" as "the actual, constructive, or attempted transfer from one person to another of a controlled substance, other drug, device or cosmetic whether or not there is an agency relationship." 35 P.S. § 780-102. Based upon the common meaning of the term "transfer," our Supreme Court has held that a person "actually transfers drugs whenever he physically conveys drugs to another person." *Commonwealth v. Murphy*, 844 A.2d 1228, 1233–34 (Pa. 2004);[6] *see also* 1 Pa.C.S. § 1903(b) (requiring courts, in general, to construe statutory words and phrases according to their common and approved usage). An exchange of money or something of value is not required; "all that is necessary is that the transfer be between two people." *Commonwealth v. Metzger*, 372 A.2d 20, 22 (Pa. Super. 1977).

While aspects of Scott's argument may have some commonsense appeal, neither the facts of this case nor the current state of Pennsylvania law permit reversal on this basis. To the contrary, based upon our Supreme Court's interpretation of the statutory term "deliver," and mindful of the legal standard for a sufficiency review, we conclude that the Commonwealth sufficiently proved that, in exchange for Savage's money, Scott obtained drugs from his dealer and then delivered the drugs that killed Savage via his

_____

[6] A person constructively transfers drugs when "he directs another person to convey drugs under his control to a third person or entity." *Murphy*, 844 A.2d at 1234.

- 11 -

physical conveyance to Wandell, who acted as Savage's agent. The record reflects that Wandell testified that she and Savage planned in advance to get together to obtain and use drugs; Savage gave Wandell his money for the drug purchase; she gave Scott the money from Savage; the dealer handed fentanyl to Scott who handed it to Wandell; she held all the fentanyl that she and Savage purchased to use together when they entered the park; Savage asked Wandell in the park where their drugs were and Wandell pointed to them; and Savage snorted two bags of fentanyl. *See* N.T., 3/27-30/2023, at 122-23, 130, 173, 201, 203, 207.

Even assuming that a mutual plan to obtain and use drugs together could overcome the physical conveyance between Scott and Wandell as Savage's agent, we agree with the trial court that the facts did not establish that such a plan existed between Savage and Scott. Trial Court Order and Opinion, 8/18/2023, at 9 (pagination added). Savage's plan was simply to use with Wandell. Savage did not have a personal relationship with Scott; Scott only became involved when Wandell could not reach Scott's mother to purchase drugs for her and Savage, and Scott offered to facilitate a purchase for them instead. Savage did not know any of the three drug dealers Scott used to obtain the drugs. In fact, the record reflects that Savage provided transportation from seller to seller, but he was frustrated that he had to drive Scott all over Harrisburg and did not intend to share drugs with Scott. *See* N.T., 3/27-30/2023, at 223, 258.

Wandell and Scott may have ended up using drugs together, but Savage never used with Scott. To the contrary, Savage was angry that he had to drive Scott around while Scott and Wandell used and that he then had to wait longer to use the drugs he had purchased from Scott because of Scott's overdose. *See id.* at 140, 203. Furthermore, when Scott saw that Savage had an adverse reaction, Scott believed that Savage had stolen the drugs from Scott's personal stash and told Wandell that Savage deserved to overdose. *Id.* at 142; *see also id.* at 201 (Wandell testifying that Scott had his own separate drugs and that she did not hand any drugs to Scott in the park). Thus, not only does Scott's argument fail to reflect the current state of the law in Pennsylvania, it also is factually incongruent with a theory of joint acquisition and use, to the extent Pennsylvania law would support such a theory.[7]

---

[7] The statutory language employed by the General Assembly makes the viability of a joint acquisition/use theory unlikely. As stated above, culpability for DDRD occurs if a "person," inter alia, "delivers" or "gives" a controlled substance in violation of section 13(a)(30) of the Drug Act to "another person" who dies as a result of using the controlled substance; "delivery" occurs, in relevant part, when there is an actual or constructive "transfer from one person to another[.]" 18 Pa.C.S. § 2606(a); 35 P.S. § 780-102. As written, and as interpreted by our Supreme Court, the statute applies to any person who physically conveys a controlled substance to another person, even if the transfer occurs between two or more people who acquire and use drugs together. *See Murphy*, 844 A.2d at 1233–34; *see also Commonwealth v. Cassell*, 993 MDA 2023, 2024 WL 4272698 (Pa. Super. Sept. 24, 2024) (non-precedential decision) (affirming conviction of DDRD for a defendant who acquired and provided drugs to the decedent, which they used together, and with whom the defendant had a personal relationship). The plain language
*(Footnote Continued Next Page)*

Because the Commonwealth sufficiently proved that Scott delivered the drugs to Savage that ultimately killed him, no relief is due.

## Jury Instructions

In his second issue, Scott argues that the trial court erred by denying his request to instruct the jury on joint acquisition and use. Scott's Brief at 38-43. Without such an instruction, Scott argues, the jury had no ability to contrast the Commonwealth's delivery theory with the defense's joint acquisition theory, which Scott contends was "plausibly consistent" with the trial evidence. *Id.* at 40-42.

We review this claim pursuant to the following standard:

> In reviewing a challenge to the trial court's refusal to give a specific jury instruction, it is the function of this Court to determine whether the record supports the trial court's decision. In examining the propriety of the instructions a trial court presents to a jury, our scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury

---

used in both the DDRD statute and the definition of "delivery" has broad applicability beyond "drug dealers."

If the General Assembly did not intend for joint users to be criminally culpable for the death of another user, it must address this by amending the statute. When the language is clear and unambiguous, we are mandated to apply the statute as it is written. *See* 1 Pa.C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.").

instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the [a]ppellant was prejudiced by that refusal.

*Commonwealth v. Thomas*, 904 A.2d 964, 970 (Pa. Super. 2006) (cleaned up; citations omitted); *see also Commonwealth v. Browdie*, 671 A.2d 668, 674 (Pa. 1996) ("Instructions regarding matters which are not before the court or which are not supported by the evidence serve no purpose other than to confuse the jury.").

As our discussion regarding the sufficiency of the evidence indicates, Pennsylvania law on "delivery" focuses upon a physical conveyance of drugs between two people. *See Murphy*, 844 A.2d at 1233–34; *Metzger*, 372 A.2d at 22. The delivery instruction issued by the trial court accurately reflected Pennsylvania law. Furthermore, even if a joint plan to use drugs together could overcome a physical conveyance, as we explained in our analysis of Scott's first issue, Savage did not have a plan to use with Scott; he had a plan to buy drugs through Scott to use with his friend Wandell. As such, we will not interfere with the trial court's ample discretion to deny Scott's request for a joint acquisition/use charge. *See Commonwealth v. Baker*, 963 A.2d 495, 506 (Pa. Super. 2008) (stating that a particular jury instruction is warranted only where there is evidence supporting such an instruction).

## Conclusion

Because the evidence was sufficient to support Scott's convictions, and the trial court did not abuse its discretion by rejecting Scott's request to

instruct the jury regarding a joint use/acquisition theory, we affirm his judgment of sentence.

Judgment of sentence affirmed.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 10/01/2024