J-A15023-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CHARLES CLAYTON CASSELL III | : | |
| | : | |
| Appellant | : | No. 993 MDA 2023 |

Appeal from the Judgment of Sentence Entered May 1, 2023
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0000378-2022

BEFORE:   DUBOW, J., BECK, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BECK, J.:                    **FILED: SEPTEMBER 24, 2024**

Charles Clayton Cassell III ("Cassell") appeals from the judgment of sentence imposed following his convictions, in relevant part, of third-degree murder, drug delivery resulting in death ("DDRD"), possession with intent to deliver ("PWID")[1] by the York County Court of Common Pleas ("trial court"). Cassell argues that the evidence was insufficient to prove that he delivered the drugs to Angelique Smith ("Smith") that caused Smith's overdose death. Alternatively, he contends that the trial court abused its discretion by denying his request to instruct the jury that possession and acquisition of drugs may

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(c), 2506(a); 35 P.S. § 780-113(a)(30).

be constructive and joint. Following our careful consideration of his arguments, we affirm.

Smith died of a fentanyl overdose on October 23, 2020, at age twenty-three. Police became aware of the overdose from Cassell's 911 call at 7:45 p.m., three minutes after Cassell parked his car in the lot behind Royal Farms convenience store in York, Pennsylvania. Smith was already deceased when emergency assistance arrived. Police found Smith's body dressed in disheveled clothes sitting in the front passenger seat of Cassell's car, slumped over towards the drivers' side. Police also observed leaves underneath her body, a container of food from Weis Markets near her feet, and a syringe in the center console.

At the scene, Cassell appeared to be nervous, anxious, and spoke quickly. N.T., 3/20-22/2023, at 96. Cassell told the two officers who interviewed him in the parking lot that Smith was his girlfriend,[2] that they had

_____

[2] Later, when he was interviewed at the police station, Cassell, who was thirty years older than Smith, referred to himself as Smith's "protector" and elaborated upon his view of their relationship:

> I was more than just a boyfriend. One day I am dad. Her dad kicked her out of her house. One day I am dad. One day I am a parent. One day I am a boyfriend. The next day I am a therapist. I wore many hats. That's why it's like so devastating to me. Like she was everything to me. And she, um, it wasn't as much romantic as we just had a bond that was, you know, some days she was my child. Some days she was my girlfriend. Some days I felt like I was a psychiatrist and I am trying to help her.

*(Footnote Continued Next Page)*

shared two bags of what they thought was heroin earlier, and that Smith had obtained the drugs. N.T., 3/20-22/2023, at 96-97, 104, 117. Police observed that Cassell appeared to be under the influence of a substance because he rambled, repeated his words, and stumbled. *Id.* at 119-20. Nevertheless, he seemed to understand the severity of the situation and consented to searches of his car and cell phone. *Id.* at 121. Police interviewed Cassell several days later at the police station. Thereafter, police charged Cassell with the aforementioned crimes.

At Cassell's two-day jury trial, the Commonwealth established the following facts. The day before Smith's death, October 22, 2020, Smith left a drug rehabilitation facility that she was supposed to attend following incarceration. *Id.* at 123. Smith made her way to a Turkey Hill convenience store in Lancaster, where she encountered Jena Parrish in the late afternoon. Parrish and Smith did not know each other. Parrish noticed that Smith looked anxious and was pacing. Smith told Parrish that she was looking for a ride to York, that she wanted to get high, and asked Parrish to get her "dope." *Id.* at 265. According to Parrish, Smith did not appear to be high and had no money, drugs, or other belongings beyond the clothes that she was wearing.

---

N.T., 3/20-22/2023, at Commonwealth's Exhibit 14 (Cassell's police interview). Although Cassell lived out of his car and a storage unit, he periodically was employed through a temporary agency and financially provided for Smith, including giving her money while she was in jail and buying her a cell phone after she ran away from rehab. *Id.*

*Id.* at 266-67. Parrish declined to find drugs for Smith but allowed Smith to wait outside her house and to use her cell phone periodically. The last time Parrish saw Smith was mid-morning on October 23, 2020, when Smith left in a car. *Id.* on 262.

Cell phone logs revealed that Smith had used Parrish's phone to text Cassell at 10:50 p.m. on October 22, 2020. *Id.* at Commonwealth's Exhibits 24-25 (cell phone records). Smith told Cassell that she might go to jail and told him to answer if he got a call from any random numbers. *Id.* Cassell responded at 11:09 p.m. and asked where she was. *Id.* At 2:14 in the morning of October 23, 2020, Cassell asked Smith if she wanted him "to get" her. *Id.* Around 8:00 a.m., Smith responded that she was in Lancaster and asked him to pick her up or to send an Uber. *Id.* Cassell agreed to send an Uber or to figure something out when his money "hits." *Id.* Smith responded that she did not have money either. *Id.* At 8:52 a.m., Cassell texted: "I'll have a guy get you, do u want to use[.]" *Id.* At 9:06 a.m., Smith responded, "Yes i want to use[.]" *Id.* Four minutes later, Cassell responded with a plan: he would have someone named Justin who lived in Lancaster take Smith to meet Cassell. *Id.* He added: "I'll get a bundle from him." *Id.*

Cassell's cell phone records indicated that he contacted multiple people to attempt to purchase drugs. *Id.* at 184. One such person was Chase Smith ("Chase"). Cassell initially texted Chase at 10:14 a.m. and asked him if he would pick up Smith in Lancaster if Cassell gave him gas money. *Id.* at

Exhibit 24-25 (cell phone records). When he received no response, Cassell arranged and paid for an Uber to pick up Smith. The Uber dropped Smith off at a Weis Market convenience store in York, where Cassell was waiting in his car.

At 1:16 p.m., Cassell texted Chase again, asking where he was and telling him that he had forty dollars and he was sick. *Id.* Chase responded that he was at his house. *Id.* Cassell told him that he was on his way. *Id.* Around the same time, Parrish, who was concerned about Smith, texted Cassell and asked if he had met up with Smith yet. *Id.* Cassell responded that he had. *Id*

Based upon the location data corresponding to Cassell's cell phone that police obtained, Cassell drove his car in a direct route to Chase's house. *Id.* at 245. Chase, who ultimately pled guilty to possession with intent to deliver a controlled substance related to this incident, then presumably provided Cassell with the drugs in exchange for Cassell's payment of $40 per their text messages.[3]

Around 2:00 p.m., Cassell parked his car behind an apartment building and Smith and Cassell shot up for the first time that day, each using half of one bag of what they thought was heroin. *Id.* at Commonwealth's Exhibit 14 (Cassell's police interview). Afterwards, Cassell drove to a park and they shot

---

[3] Smith is not related to Chase. Chase did not testify at Cassell's trial.

up again around 4:30 p.m. *Id.* Smith had her own needle and injected herself both times. *Id.* The second time, Smith used more than Cassell, consistent with Cassell's practice to "always let her … take as much as she wants" before he took a turn. *Id.* The drugs immediately affected Smith and she was happy and screaming. *Id.* Cassell drove off because he did not want Smith's screaming to draw attention to them. *Id.*

As Cassell was driving, suddenly Smith's "head went down." *Id.* Cassell pulled over, checked Smith's pulse, dragged Smith out of the car, and performed CPR because her lips were turning blue. *Id.* When she was breathing on her own, he returned her to the car and drove to a nearby parking lot instead of getting help because he was concerned about her outstanding warrants. *Id.* Cassell believed Smith started showing "signs of life" and arranged her head so "that her airway would be cleared." *Id.* After about a half hour, Cassell started "to get a little worried because this [was] going on too long," and "then all of the sudden everything shut down." *Id.* He got Smith out of the car and gave her chest compressions. *Id.* She had bile coming out of her mouth and nose and Cassell "realized right then that she drowned." *Id.*

Cassell returned Smith to the car. He claimed that he started to drive to the hospital, but he could not make it because his "car was messed up." *Id.* He ingested the remaining drugs and drove around for a while, stopping at a Sunoco gas station to discard any signs of drugs in a garbage can in the

parking lot. *Id.*[4] When he realized that Smith's body was cold, he parked at the Royal Farms convenience store and finally called 911. *Id.* at Commonwealth's Exhibit 14 (Cassell's police interview).

Notably, in the three hours between Smith's initial adverse reaction to the drugs and Cassell's eventual 911 call, Cassell drove his car in the vicinity of a hospital and a fire station stocked with Narcan. *Id.* at 221-22.

After the jury heard the above evidence, the trial court conducted a charge conference, wherein Cassell's counsel requested that the trial court instruct the jury on joint use and acquisition of drugs. *Id.* at 271-72. Cassell's argument was premised upon *United States v. Semler*, 858 Fed. Appx. 533 (3d. Cir. 2021), an unpublished federal case, which interpreted the Federal Controlled Substances Act, 21 U.S.C. § 841, and held that the district court erred by not instructing the jury on joint and simultaneous possession of a controlled substance between two personal co-users. The trial court declined to issue the instruction, opining that there were differences between the Controlled Substances Act and Pennsylvania law. N.T., 3/20-22/2023, at 272.

During the jury charge, the trial court issued the following instruction to the jury regarding the term "deliver":

> The term deliver includes the actual or constructive transfer from one person to another of the controlled substance. It does not

---

[4] Presumably, Cassell also spent time deleting recent texts from his cell phone. An officer looked through Cassell's phone with his permission at the scene and did not see any texts about drugs, which is at odds with the cell phone data that police later retrieved. *Id.* at 122, 176.

require the transfer to involve profit or the exchange of money. Rather, the transfer need only involve the conveyance of the controlled substance. A delivery may take place between two persons even though one of them may be acting as the agent for the other.

*Id.* at 326-27. At the conclusion of the jury charge, counsel for Cassell renewed his objection to the trial court's refusal to provide the requested joint acquisition/use charge. *Id.* at 334.

The jury found Cassell guilty of third-degree murder, DDRD, PWID, and several other crimes not pertinent to this appeal. On May 1, 2023, the trial court imposed an aggregate sentence of twenty-three and one-half years to forty-seven years of incarceration. Cassell filed a post-sentence motion, which the trial court denied.

Cassell filed a timely notice of appeal. Both Cassell and the trial court complied with Pa.R.A.P. 1925. Cassell asks this Court to decide whether the jury's guilty verdicts for third-degree murder, DDRD, and possession with intent to deliver were supported by sufficient evidence, arguing that the Commonwealth failed to prove that Cassell delivered the drugs to Smith that led to her death. Cassell's Brief at 6. Alternatively, Cassell contends that the trial court erred by not instructing the jury regarding joint use and acquisition of drugs. *Id.*

## Sufficiency of the Evidence

We review Cassell's challenges to the sufficiency of the evidence supporting his convictions according to the following standard:

Because a determination of evidentiary sufficiency presents a question of law, our standard of review is de novo and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the [factfinder] to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the [factfinder].

*Commonwealth v. Rosario*, 307 A.3d 759, 764-65 (Pa. Super. 2023) (citation omitted).

In relevant part, section 780-113(a)(30) of the Controlled Substance, Drug, Device and Cosmetic Act ("Drug Act"), commonly known as PWID, prohibits a person not registered under the Drug Act from engaging in "manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance." 35 P.S. § 780-113(a)(30).

A person commits the crime of DDRD when (1) he "intentionally administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled substance"; (2) such act violates

Section 780-113(a)(14) or (30) of the Drug Act;[5] and (3) "another person dies as a result of using the substance." *See* 18 Pa.C.S. § 2506(a); *see also Commonwealth v. Peck*, 242 A.3d 1274, 1281 (Pa. 2020).[6]

To establish DDRD, the Commonwealth need not prove that the defendant intended to cause the death of another. *See Commonwealth v. Kakhankham*, 132 A.3d 986, 993 (Pa. Super. 2015). Instead, the Commonwealth must establish that the defendant's act of administering, dispensing, delivering, giving, prescribing, selling, or distributing the substance was intentional and that the defendant had a "reckless disregard of death from the use of the contraband." *Commonwealth v. Carr*, 227 A.3d 11, 17 (Pa. Super. 2020). A defendant acts recklessly when he

> consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

---

[5] Section 780-113(a)(14), relating to medical practitioners, is not applicable to the instant case.

[6] Cassell does not present a separate argument as to his conviction of third-degree murder, and we therefore concentrate our discussion on PWID and DDRD. Like his conviction of DDRD, his conviction of third-degree murder relied upon Cassell's sustained failure to intervene after Smith had an adverse reaction to ingesting the fentanyl. As such, and as Cassell implicitly recognizes, if the evidence is sufficient to convict him of DDRD, it is also sufficient to convict him of third-degree murder. *See Commonwealth v. Packer*, 168 A.3d 161, 168 (Pa. 2017) (Third-degree murder is "a killing conducted with malice aforethought."); 18 Pa.C.S. § 2502(c).

18 Pa.C.S. § 302(b)(3). Given the inherent dangerousness of consuming heroin in an unknown strength and the high possibility that death could occur, the Commonwealth easily "satisfies the reckless element as to the possibility of death" when the substance involved is heroin or similar narcotics. *Commonwealth v. Storey*, 167 A.3d 750, 758 (Pa. Super. 2017). The statute requires "but-for" causation, such that the defendant's prescribed action regarding the drugs was a "direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result," so long as the defendant's actions were not "so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible." *Commonwealth v. Proctor*, 156 A.3d 261, 271 (Pa. Super. 2017); *see also* 18 Pa.C.S. § 303(a).

In his challenge to the sufficiency of the evidence, Cassell specifically disputes that the evidence established that Chase delivered drugs solely to Cassell, who then in turn delivered them to Smith. Cassell's Brief at 18. Instead, he argues that Cassell and Smith jointly possessed the drugs from the outset because Cassell and Smith equally participated in acquiring, possessing, and using the drugs. *Id.* at 18-19. Cassell urges this Court to follow the rationale of *Commonwealth v. Brown*, 798 WDA 2022, 2023 WL

- 11 -

3222860 (Pa. Super. Apr. 28, 2023) (non-precedential decision)[7] and cases from federal and other state courts[8] and find that Cassell could not have delivered the drugs to Smith because Smith already jointly or constructively possessed the drugs. *See id.* at 19-24. Instead of focusing upon discrete logistics of the drug acquisition and the plain language of the statute in

---

[7] *Brown* is a split non-precedential decision authored by President Judge Emeritus Bender affirming the pre-trial dismissal of DDRD charges against Brown, who, along with the decedent, had jointly acquired and used the heroin which ultimately killed the decedent. This Court affirmed based upon the Commonwealth's failure to preserve its issue for appellate review. *Brown*, 2023 WL 3222860 at *2. President Judge Emeritus Bender alternatively affirmed because Brown and the decedent jointly constructively possessed the drugs from the outset as co-users with a plan to obtain drugs for joint personal use. *Id.* at **3-10. Although Brown physically obtained the drugs from her personal contact outside of the decedent's presence before sharing the drugs with the decedent, President Judge Emeritus Bender agreed with the trial court that Brown could not have transferred possession of the drugs to the decedent when the decedent already possessed the drugs. *Id.* at **9-10. However, *Brown* is non-precedential, both because it is unpublished and because President Judge Emeritus Bender's reasoning did not garner a majority. *See E.C.S. v. M.C.S.*, 256 A.3d 449, 456 (Pa. Super. 2021) (noting that, pursuant to 210 Pa. Code. 65.37, unpublished decisions are not binding); *Estate of Agnew v. Ross*, 110 A.3d 1020, 1026 n.6 (Pa. Super. 2015) ("Unless an issue in a panel decision commands a majority both as to result and as to rationale, the principle embodied in the issue is not precedential."), *rev'd on other grounds*, 152 A.3d 247 (Pa. 2017). Judge Kunselman concurred in the result only without explanation. Senior Judge Colins concurred as to President Judge Emeritus Bender's waiver finding, but otherwise dissented on the merits.

[8] For example, Cassell again relied upon *Semler*. There, the Court of Appeals for the Third Circuit interpreted the term "distribute" in the Controlled Substances Act as incorporating concepts of possession and control. *See Semler*, 858 Fed. Appx. at 538-39. The court declined to interpret the statute in a "hyperliteral" fashion because it would turn any physical handoff of drugs into a felony distribution, which would divert punishment from traffickers to end users sharing small amounts of drugs socially. *Id.*

question, Cassell implores this Court to consider that Cassell and Smith were two addicts with a personal and non-commercial relationship who mutually planned to acquire and use the drugs together. *Id.* at 30-32. From Cassell's perspective, the plan between co-users should be determinative of whether they jointly acquired possession or whether one delivered drugs to the other. *Id.* at 31.[9]

Significantly, the Drug Act defines "deliver" and "delivery" as "the actual, constructive, or attempted transfer from one person to another of a controlled substance, other drug, device or cosmetic whether or not there is an agency relationship." 35 P.S. § 780-102. Based upon the common meaning of the term "transfer," our Supreme Court has held that a person "actually transfers drugs whenever he physically conveys drugs to another person." *Commonwealth v. Murphy*, 844 A.2d 1228, 1233–34 (Pa. 2004).[10] An exchange of money or something of value is not required; "all that is necessary is that the transfer be between two people." *Commonwealth v. Metzger*, 372 A.2d 20, 22 (Pa. Super. 1977).

---

[9] Cassell's argument exclusively focuses upon whether the Commonwealth proved that he delivered the drugs to Smith in a sufficient fashion to convict him of PWID, DDRD, and third-degree murder. We observe that his argument does not address whether any other acts that may trigger criminal liability under DDRD are applicable, such as the term "give."

[10] A person constructively transfers drugs when "he directs another person to convey drugs under his control to a third person or entity." *Id.*

- 13 -

While aspects of Cassell's argument may have some commonsense appeal, based upon our Supreme Court's interpretation of the statutory term "deliver," and mindful of the legal standard for a sufficiency review—which requires us to view the facts in the light most favorable to the Commonwealth, permits the Commonwealth to use wholly circumstantial evidence to establish each element, and does not require the Commonwealth to rule out every possibility of innocence to sustain its burden—we conclude that the Commonwealth's direct and circumstantial evidence was sufficient to prove that Cassell physically conveyed the drugs to Smith. Upon learning that Smith had left rehabilitation and needed help, Cassell, who was Smith's self-described boyfriend, protector, father, therapist, and psychiatrist, immediately initiated the conversation about using, contacted his drug connections, arranged and paid for Smith's transportation, and bought Smith food and a cell phone. He then offered Chase $40.00 to buy drugs, drove himself and Smith to Chase's house, obtained the heroin that turned out to be the deadly fentanyl, provided the drugs to Smith, and twice "let" Smith "take as much as she want[ed]" before using himself. *Id.* at Exhibit 24-25 (Cassell's police interview). Without her own money, cell phone, and transportation, the jury was entitled to believe that Cassell, who had money, a telephone, drug connections, and a car, arranged to buy the drugs from Chase, paid for the drugs, received possession of the drugs, and physically conveyed the drugs to Smith that ultimately killed her. But for Cassell's assistance and conveyance

- 14 -

of the drugs to her, Smith would not have ingested the deadly fentanyl purchased from Chase.

As for Cassell's argument regarding constructive possession, we note that the concept is typically "a pragmatic construct to deal with the realities of criminal law enforcement" that permits a factfinder to infer from a set of facts that possession of the contraband was more likely than not. ***Commonwealth v. Mudrick***, 507 A.2d 1212, 1213 (Pa. 1986). Even assuming arguendo that a mutual plan to obtain and use drugs together was not a delivery for the purposes of PWID and DDRD despite a physical conveyance between co-users, the facts of this case do not support Cassell's argument that Cassell and Smith jointly possessed the drugs. Clearly, Smith's conversation with Parrish supports the notion that Smith, an addict whose brush with the criminal justice system interrupted her ability to satisfy her addiction, desired to obtain and use drugs. But Smith's desire to use and her acquiescence in Cassell's plan do not equate to her simultaneous joint constructive possession. To constitute joint constructive possession, the "evidence must show a nexus between the accused and the item sufficient to infer that the accused had the power and intent to exercise dominion and control over it." ***Commonwealth v. Peters***, 218 A.3d 1206, 1209 (Pa. 2019). Under the totality of the circumstances, the evidence circumstantially establishes that Smith may have had access to the drugs, but she did not have control over them. Not only did Cassell make the arrangements, drive the

- 15 -

car, and pay for the drugs for Smith in her dependent state, Cassell's police interview established that any access Smith had to the drugs was subject to Cassell's control, particularly his statement that he "let" Smith take what she wanted.

Because the Commonwealth sufficiently proved that the Cassell delivered the drugs to Smith that ultimately killed her, no relief is due.

## **Jury Instructions**

In his second issue, Cassell argues that the trial court erred by denying his request to instruct the jury on joint acquisition and use. Cassell's Brief at 32-35. Without such an instruction, Cassell argues, the jury had no ability to contrast the Commonwealth's delivery theory with the defense's joint acquisition theory, which Cassell contends was "plausibly consistent" with the trial evidence. *Id.* at 34.

We review this claim pursuant to the following standard:

In reviewing a challenge to the trial court's refusal to give a specific jury instruction, it is the function of this Court to determine whether the record supports the trial court's decision. In examining the propriety of the instructions a trial court presents to a jury, our scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested

charge does not require reversal unless the [a]ppellant was prejudiced by that refusal.

*Commonwealth v. Thomas*, 904 A.2d 964, 970 (Pa. Super. 2006) (cleaned up; citations omitted); *see also Commonwealth v. Browdie*, 671 A.2d 668, 674 (Pa. 1996) ("Instructions regarding matters which are not before the court or which are not supported by the evidence serve no purpose other than to confuse the jury.").

As our discussion regarding the sufficiency of the evidence indicates, Pennsylvania law focuses upon a physical conveyance of drugs between two people. *See Murphy*, 844 A.2d at 1233–34; *Metzger*, 372 A.2d at 22. Even if the inference of joint constructive possession could overcome the physical conveyance, the evidence clearly indicated that Cassell spearheaded the plan to obtain drugs and maintained control over the drugs. Smith may have mutually desired to use and accompanied Cassell while he obtained the drugs, but the evidence does not support that she had control over the acquisition and use of the drugs. As such, we will not interfere with the trial court's ample discretion to deny Cassell's request for a joint acquisition/use charge. *See Commonwealth v. Baker*, 963 A.2d 495, 506 (Pa. Super. 2008) (stating that a particular jury instruction is warranted only where there is evidence supporting such an instruction).

## Conclusion

Because the evidence was sufficient to support Cassell's convictions, and the trial court did not abuse its discretion by rejecting Smith's request to

instruct the jury regarding a joint use/acquisition theory, we affirm his judgment of sentence.

Judgment of sentence affirmed.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 9/24/2024